**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**COAST DELIVERY SERVICE, INC., Respondent.**

**No. 24744.**

United States Court of Appeals, Ninth Circuit.

Jan. 26, 1971.

Daniel Katz (argued), Arnold Ordman, Gen. Counsel, Dominick L. Manoli,

Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., Abraham Siegel, Director, N.L.R. B., Los Angeles, Cal., for appellant.

Rodney Robertson (argued), of Elliott, Robertson & Peterson, Palo Alto, Cal., W. Thomas Arruda, Oakland, Cal., Brundage & Hackler, Los Angeles, Cal., for appellee.

Before BARNES and DUNIWAY, Circuit Judges, and BYRNE, District Judge.*

BYRNE, District Judge:

The National Labor Relations Board (hereinafter the Board) found, in agreement with the Trial Examiner, that Coast Delivery Service, Inc. (hereinafter referred to as either the Respondent or the Company), violated Sections 8(a) (3) and 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (3) and (1) by discharging or laying off five employees because of their union activities and by coercively interrogating and threatening employees. The case is before the Court, upon the petition of the Board to enforce its order pursuant to Section 10(e) of the Act, 29 U.S.C. § 160(e).

In an effort to organize the employees of moving and storage companies located in and around Santa Maria, California, the Union [1] held a meeting at Carpenter's Hall on August 17, 1967. Among those who attended were five employees of the Respondent—Frank Vasquez, Sr., Salvador Casillas, Manuel Vasquez, Jr., Wayne Schwark and Ted Searle. Also in attendance was Owen Hubbard, an owner of one of the moving companies the Union was attempting to organize.

The next day, August 18, the Respondent's president, James Harrison, was informed by an owner of still another moving company of the union meeting and of his employees' attendance. Shortly thereafter, Harrison encountered these employees and related to

---

* Honorable William M. Byrne, United States District Court Judge, Los Angeles, California, sitting by designation.

1. Teamsters and Warehousemen, Local 381, International Brotherhood of Teamsters, Chauffeurs and Helpers of America.

them what he had been told. The men acknowledged the truthfulness of Harrison's information by nodding. Later that day Harrison asked Frank Vasquez (hereinafter sometimes referred to as Frank) how many people had attended the meeting. Frank replied that there "had been quite a few." The Company's president then advised Frank not to get involved with the Union. Harrison repeated this advice a week or two later, stating that "he didn't like the Union because he would like to be able to come in to his place of business, and if he didn't like the way a person smiled at him, he could fire him."

Frank ignored Harrison's advice, and on August 23, 1967, he, Searle, Casillas and Schwark signed union authorization cards. The fifth principal of this controversy, Manuel Vasquez, Jr. (hereinafter sometimes referred to as Manuel) signed a union authorization card on September 9, 1967.

On September 15, 1967, Jack Mery, the Union's business representative, met with Harrison in the latter's office. Mery told Harrison the Union represented a majority of his employees. In order to prove his claim, Mery offered to submit the authorization cards signed by the employees to a disinterested person for the purpose of checking the authenticity of the signatures against the payroll. Respondent's president was told that if he chose not to recognize the Union, the local would petition the Board for an election. Harrison opted for this approach, telling Mery, " * * * you'll be in jail like all the rest of them (specifically referring to Dave Beck and James Hoffa, former Teamsters Union presidents) pretty soon." [2]

Respondent disputes the Board's finding that it violated Section 8(a) (1) of the Act by the use of threats, warnings and coercion. The basis of this finding is Harrison's two suggestions to Frank not to become involved with the Union as well as his anti-union remarks uttered during an informal meeting held in his office and attended by Frank, Manuel, Schwark, Searle and other employees.[3] On appeal, Respondent invites this Court to act as a trier of fact and deny enforcement of the Board's order because the testimony of other persons who were present at this meeting was contrary to that of Frank and Manuel.

After considering the evidence, the Trial Examiner and the Board elected to credit that presented by the General Counsel. Because this evidence, (the testimony of Frank and Manuel) supports the Board's finding that Respondent violated Section 8(a) (1) of the Act, we find this case within the scope of the maxim:

"This court does not sit to parrot the Board's conclusions; but neither does it sit to judge the credibility of witnesses * * * or dispute the Board's choice between two fairly conflicting views, although this court might justifiably make a different choice were the matter before it de novo." (Citations omitted) NLRB v. Stanislaus Implement and Hardware Co., 226 F.2d 377, 381 (9th Cir. 1955)

Respondent persists in its contention that it did not violate Section 8(a) (1) of the Act by asserting that Harrison's statements to Frank cannot be considered because Frank, as a supervisor, was not protected by the Act. The thrust of

2. The Union has responded to the Respondent's rebuff by filing a representation petition with the Board. Because of the subsequent unfair labor practice charges the Union has filed against the Respondent, further processing of the petition has been held in abeyance pending disposition of those charges by this Court.

3. Frank testified that at this meeting, Harrison told him that if he were "forced"

to sign an agreement with the Union, he would lay "everybody off" and replace wages based on an hourly rate with a percentage form of remuneration. At the same meeting, Manuel heard Harrison warn that he was prepared to fight this union as he had fought others in the past. Manuel also heard Harrison tell the men they would "regret it" if they joined the union.

this assertion is that evidence adduced at the hearing demonstrates that Frank had been vested with supervisorial powers at the time of Harrison's purported statements. Respondent argues that Frank's supervisorial status negates a finding that it violated Section 8(a) (1) of the Act because the statute's protection is limited to "employees".

■ The second portion of Respondent's attempt to block enforcement of the Board's order to cease and desist from activities which constitute interference, restraint or coercion within the meaning of Section 8(a) (1) of the Act can be resolved in the exact manner as Respondent's initial challenge of the Board's finding. The Trial Examiner and the Board ruled on the employment status of Frank Vasquez based on evidence some of which was of questionable probative value and credibility and was so regarded by the Trial Examiner and the Board. The testimony of two employees that they were hired by Frank was held to be irrelevant because they were hired at a time when the Board concedes Frank retained vestiges of supervisorial power.[4] Testimony of a third employee was disbelieved because he admitted that he had sworn falsely in an affidavit he had given to an agent of the Board. Harrison's assertion that Frank retained the supervisory powers delegated by the previous owner was deemed devoid of specifics.[5] Frank's testimony directly controverted that of Harrison. Accordingly to him, by the end of 1966, Harrison had assumed all of his supervisory duties. In short, the Trial Examiner and the Board chose to credit the testimony of Frank over that given by Respondent's witnesses.

■ The Respondent also opposes enforcement of the Board's order on the ground there is no evidence the discharges and layoffs were motivated by hostility toward the Union and its organizing activities.

## THE DISCHARGE OF SALVADOR CASILLAS

It is uncontradicted that on September 18, 1967, Salvador Casillas and Manuel Vasquez were dispatched to make a delivery in Lompoc, California, and were then to pick up some empty cartons at Vandenberg Air Force Base on their return to Santa Maria. Mechanical problems plagued the drive to Lompoc, with the water hose and the exhaust manifold breaking. The men succeeded in reaching Lompoc, made their deliveries and then drove to a gasoline station where the water hose was repaired.

At the suggestion of Casillas, Manuel called Harrison in order to secure further instructions. The Company president testified that he told Manuel to have Casillas drive to Vandenberg where he (Manuel) was to assist a line driver[6] who needed help and that Casillas was to return to the office "as fast as he possibly could." Manuel's account of this conversation is slightly different. According to his version, Harrison did not specify individuals, but merely stated that one man was to remain with the line driver and the other was to return to the office. In any case, Manuel told Casillas of the instructions, as he understood them, which Harrison had given.

Manuel delivered Harrison's message in the truck. Because of the noise emanating from the broken exhaust manifold, it was difficult to hear and carry

---

4. It is acknowledged by the Board that the regime which controlled Coast Delivery prior to Harrison's purchase of the company had delegated supervisory powers to Frank.

5. The Trial Examiner gave little credence to the testimony of Harrison for the following reason:
    " * * * I have considered Harrison's characterization of Vasquez as

a supervisor and his description of his duties as hiring and discharging employees, dispatching employees, taking care of the office, and making pre-move surveys. Harrison gave no specific details and offered no examples of these activities on the part of Vasquez."

6. Line drivers operate vehicles engaged in interstate transportation.

on a conversation. The acoustics inside the truck were responsible, so asserted Casillas at the hearing, for his misunderstanding Manuel's message. Both men stayed to help the line driver at Vandenberg. Although this action was contrary to the instructions given him by Harrison, Manuel remained silent because he assumed that Casillas had heard the message.

When the men finished their work, they returned to the office, arriving in Santa Maria at about 5:30 P.M. There, Casillas found a note from Harrison on the office door which said that as long as he preferred to work for line drivers, he no longer could work for the Company. Harrison had also made a copy of the note and placed it on Casillas' automobile.

Casillas and Manuel drove to Harrison's residence and asked to speak to him. Mrs. Harrison informed the two men that her husband was not at home.

About 7:30 that evening, Casillas called Harrison at his home but again was informed that he was not in. Manuel, who had returned to Harrison's home about 8:00 P.M., met with the Company's president and told him of the events which had transpired that afternoon. Harrison was told that his message to Casillas had been delivered and that it was presumed to have been understood. Despite this presumption, Manuel told Harrison of the noise produced by the defective exhaust manifold and the probability that Casillas did not comply with the instructions because he had not fully heard the message. Harrison was unmoved by this explanation, telling Manuel, "I know what kind of guy he is * * * there's no excuse for him * * *."[7]

On the following morning, September 19, Casillas saw Harrison and attempted to explain to him what had happened. Harrison stated that Manuel had told him a different story. Although Harrison promised to check further with Manuel, he never did. The next day Harrison told Casillas that his discharge was final.

The facts surrounding Casillas' discharge strongly suggest that it was the product of anti-union sentiment. Casillas was one of the employees who Harrison knew had attended a union meeting convened for the purpose of organizing employees in Santa Maria's van and storage industry. Three days prior to the discharge, a union representative told Harrison that the Union had secured enough authorization cards to validate its claim that it represented a majority of the Company's employees. Also, Harrison decided to discharge Casillas without seeking an explanation from the principals involved in the incident. On this point, we find the comments of the Trial Examiner germane:

> "Why Harrison assumed that Casillas had not returned because he preferred to work for the line driver was not explained * * * It would seem obvious that there might have been a number of reasons why Casillas had not returned that afternoon, among them being the possibility of accident, or, as Harrison had been informed earlier in the day, mechanical difficulty with the truck."

Indeed, it was possible that Manuel had not forwarded Harrison's instructions to Casillas. Harrison chose not to even consider these possibilities; instead, he seized upon Casillas' failure to return as justification for his discharge.

The circumstances surrounding this firing are somewhat analogous to those present in NLRB v. Murray-Ohio Manufacturing Company, 358 F.2d 948 (6th Cir. 1966). There, a timekeeper active in union organizing activities prepared a list of employees in his department from memory. Although he did not consult

---

7. Harrison's version of his conversation with Manuel was disbelieved by the Trial Examiner because he "was not convinced * * * that Harrison's testimony was

at all times complete or that it was not affected by his awareness of the result it might have upon the issues in this proceeding."

company records in preparing this list, the employee was discharged for "attempting to obtain unauthorized, confidential data and information from company records." The Court sustained the Board's decision that the dismissal was violative of Sections 8(a) (3) and (1) of the Act, noting that the discharged employee was never given an opportunity to state his version of the incident.

In the instant case, an employee who expressed interest in securing union representation was abruptly terminated, the Company falling back on the pretext of "failing to obey instructions." Given the discharge's abruptness and its less than fortuitous timing (shortly after Respondent's president had been informed by a union representative that the union represented a majority of the employees), we cannot say the Board and the Trial Examiner abused their discretion when they found the dismissal of Salvador Casillas to be in violation of Sections 8(a) (3) and (1) of the Act.[8]

## THE DISCHARGE OF FRANK VASQUEZ

The Respondent contends that Frank Vasquez was discharged because his work was not satisfactory. Frank's misconduct is said to be responsible for excessive damage claims at the warehouse and the loss of the King Van Lines agency.

On September 22, 1967, Frank agreed to accept an out-of-state shipment from King Van Lines, for whom Respondent acted as agent. Because drivers on similar occasions had failed to appear at the warehouse on time, Frank, with Harrison's approval, agreed to meet the King driver on condition that he state a defi-

nite time of arrival. The driver promised to be at the warehouse at 8:00 A.M. Frank claimed that he arrived at the warehouse between 7:45 and 8:00 the next morning and remained there until 9:15 or 9:30, at which time he left for his home because the King driver had failed to appear.

The next day, Sunday, September 24, Frank went to the Respondent's warehouse to borrow a set of battery cables. While he was there, Harrison drove up and asked him to come to the office a little later. Frank reported as requested and was told by Harrison that he was being terminated. When Frank pressed for a reason, Harrison replied that he had failed to show up for work on September 23, and this failure had cost the Company a great deal of money because the shipment he was to receive had been placed in another warehouse. Harrison ignored Frank's protestation that he did report for work by showing him a written statement to the contrary from the King driver.

Although Frank's action was considered by Harrison to be a manifestation of his unreliability, the Company's president assured his discharged employee that he would have no difficulty securing immediate employment. Apparently Harrison believed his assurance to be well founded, because prior to informing Frank of his dismissal, he had contacted officials of Bear Van Lines and recommended the employment of Frank. Indeed, Harrison told these officials that Bear would "be foolish if they didn't hire (Frank)."

Harrison's unexplained willingness to dismiss an employee based on the word of a stranger was a significant factor in

8. In so sustaining the Board, we are not unmindful of Respondent's contention that Casillas had been warned on August 8, 1967, that if he disobeyed orders again, he would be discharged. (The Trial Examiner credited Casillas' testimony that he had received no such warning.) We reject the suggestion that Casillas' discharge was the culmination of a history of insubordination, noting as the Trial Examiner did, that late in December,

1967, and early 1968, Harrison expressed interest in re-employing Casillas. We agree with the Trial Examiner that the Company's willingness to re-employ Casillas is inconsistent with the announced reason for his discharge only a few months earlier. See, NLRB v. Montgomery Ward & Company, 242 F.2d 497, 502 (2d Cir. 1957), cert. den. 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41.

the resolution of this issue. The Trial Examiner has effectively summarized its significance as follows:

"With respect to the assertion that Vasquez was discharged because Harrison believed that he had failed to appear at the warehouse on the morning of September 23, Harrison did not offer to explain why he was willing to accept the unsupported word of the King Van Line driver that Vasquez had not been present at the warehouse at the appointed time but had refused to check Vasquez' story or even speak to his son after Vasquez had claimed that his son had seen him at the warehouse at the time in question."

It is noteworthy that Donald Colvin, one of the Company's employees who did not attend the August union meeting, was responsible for causing "excessive damage" to a shipment of King Van Lines prior to the incident involving Frank Vasquez. Harrison admitted that despite this dereliction, he did not discharge Colvin.

In the context of Harrison's relationship with Frank, we believe there is substantial evidence which supports the Board's conclusion that anti-union sentiment · was the motivating force of this dismissal. It was known by Harrison that Frank was one of the employees who had attended a union organizing meeting. On two occasions, Harrison advised Frank not to become involved with the Union. Although the Respondent asserts that the incident of September 23 was "the last straw", its own president believed that another company would be "foolish" if it did not hire Frank. These facts coupled with Harrison's total faith in the word of a stranger amply support the Board's finding that this discharge was violative of Sections 8(a) (3) and (1) of the Act.

## THE LAYOFF OF TED SEARLE

On Saturday, September 23, 1967, Ted Searle and Manuel Vasquez were notified by Harrison not to report the following Monday because there was no work.[9] This notification was instituted one day after Searle and Manuel had attended the previously described "informal" meeting in Harrison's office. At the meeting, Manuel heard Harrison state that if the men joined the Union, they would regret it. Harrison was aware that Searle and Manuel had attended the August union meeting.

Respondent's announced reason for the layoffs is not supported by the evidence adduced at the hearing. The men were laid off on September 23 for lack of work, yet four days later Harrison was forced to give away a moving job because he did not have enough men to handle it. Harrison admitted that he knew of this job at least two days before it was to be performed. Although the Company's president was laying off because of "no work" and then forced to give away business because he did not have sufficient numbers of workers, the Company maintained the charade that hard times had hit Coast Delivery. On September 25 and 26, Manuel called the Company's office and asked for work, but was told by Mrs. Harrison that none was available.

At the time of the layoff, Ted Searle told Harrison that he would have to leave Santa Maria if things "were slowing down." Because he received no indication from Harrison that the layoff was only temporary, Searle left town in search of work. Harrison's claim that he subsequently attempted to locate Searle is somewhat convenient in light of the circumstances surrounding the layoff.

Although our concern is limited to the layoff of Searle, this layoff cannot be viewed in isolation. Both Manuel and

9. The complaint only alleged that Manuel Vasquez was unlawfully discharged on October 4, 1967; the legality of his layoff was not challenged. Accordingly, the Trial Examiner made no finding in regard to the said layoff.

Searle were known to have attended a union meeting where organization of Santa Maria's van and storage employees was discussed. Searle was laid off shortly after the Company's president learned that the Union represented a majority of his employees. Only hours before the layoff, Searle had attended a meeting where Harrison made anti-union remarks. These facts persuade us the Board correctly found the layoff of Ted Searle was a violation of Sections 8(a) (3) and (1) of the Act.

## THE DISCHARGES OF MANUEL VASQUEZ AND WAYNE SCHWARK

As previously indicated, Manuel Vasquez was laid off on September 23, 1967. On September 28, Manuel secured temporary employment with LaRue Kulp, who worked as an owner-operator on a percentage basis for Pacific Van & Storage Company, for whom Respondent acted as agent. When the Union established picket lines at the Respondent's premises (the employees of the several companies had decided to strike all the employers in the area), both Schwark and Manuel indicated their objections to crossing the picket lines. On October 4, both men received telegrams informing them they were being terminated because of their refusal to work.[10]

Later that evening, following transmission of the telegrams to Schwark and Manuel, Harrison called George Gunning and Horace Ferranti, who were then working in San Diego, California and offered them jobs. On October 9, Gunning and Ferranti began working for Respondent. Each was paid $3.25 per hour, the rate they received in San Diego. The other employees of the Company were receiving $2.60 to $2.90 per hour.

We believe these discharges are clearly within the purview of the oft repeated rule: "An employee who refuses to cross a picket line is in effect joining the strike and engaging in concerted activities protected by the Act." NLRB v. West Coast Casket Company, Inc., 205 F.2d 902, 905 (9th Cir. 1953). Because the Act's protection encompasses employees who have been laid off, we find no merit in Respondent's contention that Manuel's discharge was outside the scope of the Act.

Respondent also contends that the Board's bargaining order cannot be enforced because, "It has never been established that the Union has achieved a majority." The record clearly refutes this contention. At the hearing, the parties stipulated to an "appropriate" bargaining unit consisting of seven employees. Included in this unit were the five employees who had signed union authorization cards.

Having satisfied ourselves with the legitimacy of the Board's finding that the Union represented a majority of employees within a clearly defined bargaining unit, we now consider the propriety of the Board's bargaining order.

Within less than three weeks after learning the Union represented a majority of its employees, Respondent found cause to discharge or lay off all the employees who composed the Union's majority. These calculated dismissals have been exposed as "unfair labor practices" within the meaning of the National Labor Relations Act. The Trial Examiner found that these practices had "deprived the union a fair opportunity to prove its representation status in an election." The Board concurred in this finding and adopted the Trial Examiner's recommendation that the issuance of a bargaining order was the proper vehicle to remedy Respondent's unfair practices.

It is clear that this employer "has succeeded in undermining a union's strength and [destroyed] the laboratory conditions for a fair election * * *"

10. Mrs. Harrison testified that after learning of the telegram sent to Schwark, she thought her husband had forgotten to send one to Manuel, so she "rectified" his "mistake." She admitted, however, that, although her husband told her that she should not have sent the telegram to Manuel, nothing was done to correct the matter.

NLRB v. Gissel Packing Company, Inc., 395 U.S. 575, 612, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547 (1969). As a consequence, we find the Board's order within the province of the teachings announced in *Gissel.* Cf. NLRB v. American Cable Systems, Inc., 427 F.2d 446 (5th Cir. 1970).

Lastly, Respondent complains that the Trial Examiner was prejudiced in favor of the Union and against the Company. Our review of the record reveals no such prejudice.

The Board's order will be enforced in full.