**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL VAN LINES, Respondent.**

**No. 25698.**

United States Court of Appeals, Ninth Circuit.

Sept. 3, 1971.

906

man, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., Abraham Siegel, Director, NLRB, Los Angeles, Cal., for petitioner.

Norman Kirshman (argued), of Goldstein, Gentile & Kirshman, Beverly Hills, Cal., W. Thomas Arruda, Oakland, Cal., Brundage & Hackler, Los Angeles, Cal., for respondent.

Before BARNES, DUNIWAY and TRASK, Circuit Judges.

DUNIWAY, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order requiring International Van Lines (the Company) to cease and desist from interfering, in violation of section 8(a) (1) of the National Labor Relations Act (the Act) (29 U.S.C. § 158(a) (1)), with its employees' exercise of their rights under section 7 of the Act (29 U.S.C. § 157) and from discriminatorily discharging employees who favor unionization, in violation of sections 8(a) (1) and 8(a) (3) of the Act (29 U.S.C. §§ 158(a) (1) & (3)), and also requiring the Company to reinstate the discriminatorily discharged employees and to bargain with the Union.[1] We remand the case to the Board for further findings and for modification of its order.

The *dramatis personae* are: Robert L. McEwan, president of the Company and active head of its business, (McEwan); his son, John G. McEwan, a student then approximately 18 years old who worked for the Company during the summer, (Johnny McEwan); Ben H. Sanders, secretary-treasurer of the Union and a prime Union organizer; Manuel Vasquez, Robert Vasquez, Richard Dicus, and Salvador Casillas, employees of the Company who were discharged after they refused to cross a picket line thrown around the Company's premises; and David Dicus, a student then about 17 years old, the son of Richard Dicus, and a summer employee of the Company.

Abigail Baskir, Washington, D. C. (argued), Stanley R. Zirkin, Arnold Ord-

1. Teamsters and Warehousemen, Local 381, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

The setting was a Union campaign, begun in August 1967, to organize the employees of all the moving and storage firms located in and around Santa Maria, California. There were about 23 such firms; the Company is one.[2] The Company was not part of any employer association or multi-employer bargaining unit. The Union's picketing of the Company, which began on October 4, 1967, formed part of its campaign. Some of the charges of unfair labor practices under section 8(a) (1) arose from alleged actions of the Company before the picketing; other charges grew out of the Company's response to the picketing.

A. *Charges that the Company threatened its employees, thereby interfering with their right to organize under section 7, in violation of section 8(a) (1).*

██ The gist of these charges is that the Company communicated to some of its employees, using Johnny McEwan as an intermediary, threats of economic reprisal if the employees voted to unionize. Three conversations in which Johnny McEwan participated underlie the charges.

The first conversation occurred about September 1, 1967, while Johnny McEwan, David Dicus, Robert Vasquez, and Jimmy Weaver, another employee of the Company, were unloading a truck at the Company's warehouse. David Dicus testified that Johnny McEwan said "that if the union did come in, that our fishing trips would be gone. We would never have any more, and that is about as good as I can remember on the conversation then." David Dicus could not remember how the conversation arose; Johnny McEwan "came out with that little statement, and I know there was more in the statement, but all I can remember is

actually that part. * * * " Robert Vasquez testified: "Well, John come in, and he asked us, he heard that we were joining the union, And I said, 'Yes.' Then he said that we should not, that his dad had said if we should join the union, that it is going to take all our benefits and rights, and he was going to work our 'ass.' "

The second conversation occurred around September 15, 1967, in the garage of David Dicus' father-in-law. Johnny McEwan and two other men[3] were helping David Dicus sand his car. David Dicus testified: "Well, John had heard the union was—we were trying—things about trying to get a union in, and that is what provoked—I said something about the union has better medical plans. It also gives you a future, and then he come up with a statement, his father would handle the situation the same as he did or a friend of his did in Virginia, that he would make it so hard on the workers it would make them want to quit. That is the whole conversation right there."

The third conversation occurred about September 29, 1967, at the home of David Dicus. Johnny McEwan visited the Dicus home to say good-bye before leaving for college; in addition to those two, only David's wife was present. David testified that the conversation began when he told Johnny that he had signed a union authorization card "because I wanted to see the rest of the workers get a good break. There is no future in moving, in the moving business, and I wanted to see a future in it." David said that Johnny's reply was "the same conversation that his dad handled it the same way, either he did or his friend did, he would make it so hard on the workers that they would want to quit if the union did come in."

2. A related case is N.L.R.B. v. Coast Delivery Service, 9 Cir., 1971, 437 F.2d 264.

3. One of the men was David Dicus' brother-in-law, and an employee of the Company. The other was a friend of David's sister-in-law; the record does not state whether he was an employee of the Company.

During the cross-examination of David Dicus by counsel for the Company, the following colloquy developed:

"Q. During these conversations, did Mr. Robert McEwan, Jr. [*sic*] tell you that he was acting for and in behalf of his father?

A. He just told me how his father would handle it. * * *

* * * * * *

Q. Did Mr. McEwan or Robert H. McEwan [*sic*] say that my father told me to tell you this and this and this?

A. No sir. He just said that his father would handle this in this manner."

Nothing in the record further illuminates the question whether the parties to the various conversations believed Johnny McEwan to be acting as a representative of his father.

Responding to the General Counsel's argument that Johnny McEwan's remarks in these three conversations were, in effect, coercive statements to employees by the Company, the Trial Examiner stated:

"These part-time, casual, summer-time employees are involved in this controversy only by the accident of birth and filial loyalty. * * * I do not think this expressed opinion of one college boy to his chum, both of whom are known to the employees as 'helpers' of summer-time duration only, constitute an unfair labor practice [under § 8(a) (1)] on the part of the Company. The General Counsel's claim that this opinion of Johnny McEwan binds the Company, based only on his relationship to his father, is in reality, an admission of just how insubstantial is the General Counsel's case."

Noting that Johnny McEwan's father did not deny making the remarks that Johnny attributed to him, the Board reversed the Examiner's conclusions:

"Such remarks were uttered on the heels of an inquiry into the union sympathies of the employees and clearly identified Johnny's interest with the interests of his father and [the Company]. * * * [W]e find that Johnny, in making the remarks and attributing them to his father, was acting as a conduit for his father and thereby coerced and interfered with the employees' exercise of their Section 7 rights. Accordingly, we conclude that in these circumstances the remarks uttered by Johnny McEwen violated Section 8(a) (1) of the Act. [footnotes omitted.]"

The Board's opinion to the contrary, it is immaterial whether the senior McEwan actually made the anti-union remarks attributed to him by his son. What is important is whether the Company communicated anti-union threats to its employees. What McEwan said to members of his family has, by itself, no bearing on that question. It might have bearing if the evidence tended to show that McEwan authorized Johnny to convey his feelings to the employees, or that the employees reasonably believed that Johnny was speaking on behalf of his father, or that Johnny intended to do so.

None of these possibilities is supported by substantial evidence on the record considered as a whole. The record made before the Trial Examiner supports only the Trial Examiner's characterization of the conversations.

The Board cites N.L.R.B. v. Champa Linen Service Company, 10 Cir., 1963, 324 F.2d 28, and N.L.R.B. v. W. R. Hall Distributor, 10 Cir., 1965, 341 F.2d 359, for the proposition that an employer's son, himself an employee, may be found to have acted on behalf of his father in making anti-union statements to other employees, and that the statements may constitute an unfair labor practice. Those cases are factually distinguishable. The evidence there tended to show that the sons' activities were in fact undertaken on behalf of their fathers and that the activities went well beyond mere casual conversation. 324 F.2d at 30; 341 F.2d at 362–363. No comparable evidence appears here.

The Board refers us to testimony which, if believed, would establish that the senior McEwan told employee Richard Dicus that the employees would lose certain benefits if the Company were unionized. The Board states, however, that McEwan's statement is not alleged as an independent unfair labor practice, but is only "used to shed light upon the true character of the Company's other activities." Wherever the statement does shed light, it does not tend to establish that Johnny McEwan's remarks were made on his father's behalf.

B. *Charges that the Company discriminatorily discharged employees for engaging in protected concerted activity, in violation of Sections 8(a) (1) and 8(a) (3).*

On September 21, 1967, the Union petitioned the Board for certification as the exclusive bargaining agent of the Company's employees. At that time five of the Company's employees had signed Union authorization cards, a clear majority of the 6-man appropriate bargaining unit. The Company received a copy of the petition from the Board on September 25, 1967, and awaited further action by the Board. It is undisputed that at no time before October 4, 1967, did the Union demand recognition by the Company; nor did it undertake any other action to notify the Company directly that it wished and was entitled to be the exclusive bargaining agent. The only notification the Company had received came from the Board, not from the Union.

On October 2 and 3 the Union held meetings of the employees of all the moving and storage companies in the Santa Maria area. Ben Sanders, the Union organizer, addressed each meeting. He stated at both meetings that the company had consented to representation elections but had later withdrawn its consent. Sanders also stated that employees of local moving and storage companies other than International Van Lines were being discharged.

The October 3 meeting concluded with a decision to strike all the moving and storage companies the following day. A picket line appeared in front of the Company's premises on October 4. Picket signs read, "Unfair to Teamsters Union Local 381" and "No elections. Why?" The men on the picket line were not employees of the Company. Some of the Company's employees were present, however, including Richard Dicus, Manuel Vasquez, and Salvador Casillas. All three refused to cross the picket line, and none reported to work the following day. McEwan testified that Robert Vasquez was not present during the picketing, but that McEwan saw Robert Vasquez drive toward the Company's premises and turn around without stopping; other testimony placed Robert Vasquez at the scene of the picketing. It is undisputed that Robert Vasquez did not report to work the next day. On October 5, 1967, Robert and Manuel Vasquez and Richard Dicus received identical telegrams that read as follows: "For failure to report to work as directed at 7 AM on Wednesday morning Oct 4 1967 you are being permanently replaced. [Signed] International Van Lines." Casillas did not receive a telegram, and it is not evident from the record how the fact of his discharge was communicated to him. It is undisputed, however, that he was discharged at about the same time and for the same reasons as the other three men. The reason given by McEwan for the discharges was that "it has been our policy * * * in the past that if a man did not show up for work, why, he was let go. Not for one day, but for two."

The Company had a moving job scheduled for October 4, the day the picketing began. After failing to find men to do that job, McEwan obtained a one-day postponement from the firm for whom the work was to be done. McEwan attempted, unsuccessfully, to secure local men as replacement employees. He then telephoned his brother, president of Mercury Van and Storage Company (Mercury) in Oxnard, California, and was

able to hire three men that Mercury had scheduled for layoff, plus two other men from the Oxnard area. The replacements were carried on Mercury's payroll while the October 5 job was being performed, and the Company reimbursed Mercury for their wages. One of the replacement workers thereafter appeared on the Company's payroll during the pay period from October 12 through October 18; another for the October 19–25 period; a third for the October 19–25 period and on four of the next five pay periods. The other two replacements never appeared on the Company's payroll.

On these facts, the Board found that the Company violated sections 8(a) (1) and 8(a) (3) of the Act by discharging the four employees. We uphold these findings.

*First*: The Trial Examiner wholly discredited, as a deliberate fabrication, Sanders' testimony that the Union's counsel had told him that the Company had consented to an election and had then reneged. The Trial Examiner also noted that nothing in the record showed that the Company had ever consented to a representation election, much less withdrawn its consent.

The Board properly regarded these findings of the Trial Examiner as legally irrelevant. Fabrication or not, it is undisputed that Sanders told the men assembled at the Union meetings that the Company had consented to an election and had then reneged. Nothing in the record suggests that the men believed otherwise, or had reason to believe otherwise. There is substantial evidence to support the Board's findings that the strike was motivated by that belief and that the purpose of the strike was to pressure the Company into holding a consent election.

4. The Board found, in the alternative, that even if the purpose of the strike was to gain immediate recognition for the Union, rather than merely to force a consent election, the strike was lawful, even absent a prior demand for recognition, since no other union was then certified as a bargaining agent. Citing Philanz Olds-

■ We agree with the Board that "a strike for the purpose of persuading an employer to agree to a consent election is lawful even though a representation petition is pending before the Board." Philanz Oldsmobile, Inc., 1962, 137 N.L.R.B. 867, 869, citing New Orleans Roosevelt Corp., 1961, 132 N.L.R.B. 248, 257–258.[4] That the strikers' belief in the Company's unwillingness was mistaken does not remove their concerted activity from the protection of section 7 of the Act. N.L.R.B. v. Phaostron Instrument & Electronic Co., 9 Cir., 1965, 344 F.2d 855, 858–859; N.L.R.B. v. McCatron, 9 Cir., 1954, 216 F.2d 212, 215. The work stoppage was a lawful and protected economic strike. *Cf.* N.L.R.B. v. Erie Resistor Corp., 1963, 373 U.S. 221, 233–234, 83 S.Ct. 1139, 10 L.Ed.2d 308.

■ *Second*: The protection given by the Act to economic strikers differs in scope from that given to participants in an unfair labor practice strike. See Snow v. N.L.R.B., 9 Cir., 1962, 308 F.2d 687, 694. Economic strikers are not automatically entitled to reinstatement:

"[A]n employer, guilty of no act denounced by the statute, has * * * the right to protect and continue his business by [filling with replacements] places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them. The assurance by respondent to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice nor was it such to reinstate only so many of the strikers as there were vacant places to be filled."

mobile, Inc., 1962, 137 N.L.R.B. 867, 869–870; United Mine Workers v. Arkansas Oak Flooring Co., 1956, 351 U.S. 62, 75, 76 S.Ct. 559, 100 L.Ed. 941; N.L.R.B. v. Washington Aluminum Co., 1962, 370 U.S. 9, 14, 82 S.Ct. 1099, 8 L.Ed.2d 298. We do not pass on this question.

N.L.R.B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 345–346, 58 S. Ct. 904, 911, 82 L.Ed. 1381. Accord, N.L.R.B. v. Fleetwood Trailer Co., 1967, 389 U.S. 375, 379, 88 S.Ct. 543, 19 L. Ed.2d 614. However, the employer is not free to discharge striking employees and *then* to find permanent replacements for them; "the discharge of economic strikers prior * * * to the time their places are filled constitutes an unfair labor practice." N.L.R.B. v. Globe Wireless, 9 Cir., 1951, 193 F.2d 748, 750. Accord, N.L.R.B. v. McCatron, 9 Cir., 1954, 216 F.2d 212, 215; N.L.R.B. v. Comfort, Inc., 8 Cir., 1966, 365 F.2d 867, 874.

■ In this case the Board found, and now argues, that: (1) The Company did not merely "replace" the four employees —*i. e.*, did not discharge them after hiring replacements in order to be able to continue its business—but rather discharged them "in order to punish [them] for taking part in the strike." And (2) even if the Company did merely replace the four employees, the replacements hired were temporary replacements only, not employees who intended to work for the Company permanently; thus the four employees were discharged before the Company had obtained permanent replacements for them. Both of these findings are supported by substantial evidence on the record as a whole.

We therefore affirm the Board's findings that the Company violated sections 8(a) (1) and 8(a) (3) of the Act by discharging the four employees. N.L.R. B. v. McCatron, *supra*, 216 F.2d at 214–215; *cf.* N.L.R.B. v. Globe Wireless, *supra*, 193 F.2d at 750.

C. *Charges that the Company refused to reinstate the discharged strikers, in violation of sections 8(a) (1) and 8(a) (3).*

The Board found that "[t]he discharge of the [four] employees, which had the natural effect of tending to prolong the strike, converted what had commenced as an economic walkout into an unfair labor strike. Accordingly, [the Company] fur-ther violated Section 8(a) (3) and (1) of the Act by refusing to reinstate, upon their unconditional applications," the four employees. We are unable to accept in full these findings of law and of fact.

■■ Turning first to the questions of law, we momentarily assume for the sake of exposition that all four employees were improperly refused reinstatement. The Board bases its argument in support of the above conclusions on the following principles: Where an employer's unfair labor practice committed during the course of an economic strike is shown to be "a significant factor" in the strike, the burden falls on the employer to show that the strike was not thereby "prolonged or aggravated." If he does not, and the strike is found to have been prolonged or aggravated by the unfair labor practice, the economic strike is converted into an unfair labor practice strike. Citing General Teamsters & Allied Workers Local Union 992 v. N.L.R.B., D.C.Cir., 1970, 427 F.2d 582. Unfair labor practice strikers are entitled upon request to reinstatement with back pay, even if the employer has in the meantime hired permanent replacements. See Mastro Plastics Corp. v. N. L.R.B., 1956, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309.

Applying these principles to this case, the Board reasons that the Company's unfair labor practice in discharging the four employees was "a significant factor" in the strike: that the Company did not meet its consequent burden; that the unfair labor practice converted the economic strike into an unfair labor practice strike; and that the four discharged workers are therefore absolutely entitled to reinstatement under the *Mastro Plastics* rule. Implicit in the Board's reasoning, though not explicitly stated, is the assumption that the conversion of the economic strike into an unfair labor practice strike necessarily converted the four discharged economic strikers into unfair labor practice strikers, to whom the *Mastro Plastics* rule properly applies.

That assumption is untenable. The strikers whose discharges constituted the

unfair labor practice were, at the time of their discharges, protesting only the original grievance. Any strikers subsequently discharged might legitimately be considered unfair labor practice strikers, for they would be protesting not only the original grievance but also the subsequent unfair labor practice. The initially discharged strikers were obviously not protesting their own discharges, which had not yet occurred. To assimilate their status to that of their co-workers who had not yet been discharged would eliminate the distinction between [the] economic-striker-reinstatement rule (*Mackay Radio & Telegraph*) and the unfair-labor-practice-striker-reinstatement rule (*Mastro Plastics*) in cases like this one.[5] Such a result is unwarranted in law and in reason.

Accordingly, we need not determine whether the economic strike was converted into an unfair labor practice strike. The four employees were economic strikers when discharged and must be so treated here. *Cf.* N.L.R.B. v. Frick Co., 3 Cir., 1968, 397 F.2d 956, 964; Philip Carey Mfg. Co., Miami Cabinet Div. v. N.L.R.B., 6 Cir., 1964, 331 F.2d 720, 729. The strikers are entitled to reinstatement unless the Company can show "legitimate and substantial business justifications" for refusing to reinstate them, one such justification being the unavailability of positions due to the hiring of permanent replacements under the *Mackay* rule. N.L.R.B. v. Fleetwood Trailers

Co., 1967, 389 U.S. 375, 379, 88 S.Ct. 543, 19 L.Ed.2d 614.

■ The Board did not pass on the question whether the discharged employees, if considered as economic strikers rather than as unfair labor practice strikers, were entitled to reinstatement. While the Board did find that the discharged employees had in fact not been permanently replaced (which we have already said is supported by substantial evidence), the Board did not inquire whether any other "legitimate and substantial business justification" existed for not reinstating the four employees. The Board has requested, however, if we find the discharged strikers not subject to the unfair-labor-striker-reinstatement rule, that we remand the case to the Board "for further findings concerning the Company's reasons for failing to reinstate the strikers." We do so.[6]

We turn now to the questions of fact surrounding the requests for reinstatement. Substantial evidence supports the Board's findings that, on December 12, 1967, Richard Dicus, Manuel Vasquez, and Robert Vasquez went to McEwan's office and unconditionally requested to be reinstated. The Company argues that the requests were in reality conditioned upon the Company's agreeing to sign a contract with the Union. While such a condition is perhaps inferable from the entire course of events surrounding this dispute, the record shows that the

---

5. Elimination of the distinction would follow, strictly speaking, only in those cases where the discharge of economic strikers constitutes "a significant factor" in the prolongation of the strike. The Board argues that "[i]n this case, the Company's unfair labor practices were clearly 'a significant factor' in the strike, since the discharge of economic strikers 'necessarily * * * restrain[s] [employees] from engaging in concerted activities for their mutual aid and protection * * '.'" The Board adduces no evidence in support of this "necessary" effect. Compare N.L.R.B. v. James Thompson & Co., 2 Cir., 1953, 208 F.2d 743, 749 (L. Hand, J.). If the discharges in this case so "necessarily" constituted "a significant factor" in prolonging the strike, dis-

charges of economic strikers will be significant factors in prolonging virtually any economic strike.

6. Strictly speaking, the Board requested us to remand the case if we find that "the strike was not converted into an unfair labor practice strike" but remained an economic strike. The view we take does not require us to answer that question. Our result, however, treats the discharged strikers as economic strikers— exactly as they would be treated had we made the finding upon which the Board predicates its request for a remand. Since the same further findings would be needed in either case, we think the remand is appropriate here.

three workers' requests for reinstatement had no conditions expressly attached. It is undisputed that McEwan declined to reinstate the three men.

The situation as to Salvador Casillas is different. Unlike the other three, who were regular employees of the Company, Casillas was a "casual" worker—one who worked for the Company only when summoned by the Company for a specific job. Casillas had been notified to come to work on October 4, the day the strike began; he did not, and was therefore discharged. According to McEwan's testimony, Casillas came to McEwan's office sometime in the latter part of November to request reinstatement. McEwan testified that Casillas "told me he could not stay out on strike any more * * * and that he had to go back to work and he asked me if he could be put on an availability list of my company." McEwan replied "that I would put him down as jobs come in, that we could use him on things, and why, we would call him." McEwan added that he had not had occasion to summon Casillas for work since then.

McEwan's testimony is all the evidence concerning the question of Casillas' reinstatement. The Board found that Casillas was in fact not reinstated, but it gave no reasons for its conclusion. On this record, we hesitate to accept such a bare finding. It is possible that the Board wholly discredited McEwan's testimony that he would place Casillas on the availability list; it is also possible that the Board accepted that testimony but found that McEwan subsequently declined to summon Casillas even though sufficient work may have been at hand. On the present record, we doubt that substantial evidence exists to support the former; we would be more favorably disposed toward the latter, if the Board could show that McEwan in fact could have used Casillas but chose not to call him. We see no need to resolve the ambiguity ourselves, however. Since we are remanding the case to the Board for other matters, we also direct the Board to determine, on remand, whether Mc-

Ewan declined to restore Casillas to the availability list or whether Casillas had been restored to the list but had not been called to work; and if the latter, whether there was work for which he should have been called, so that failure to call him amounted to refusal of reinstatement.

We do not now pass on the propriety of the Board's bargaining order in this case. It will be time enough to do so if the case comes before us again on the Board's petition for enforcement.

The case is remanded to the Board for the determinations required by Part C of this opinion and for modification of the Board's order in accordance with Part A of the opinion.