**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SKELLY OIL CO. (KANSAS CITY, MISSOURI, SKELGAS DIRECT MARKETING BRANCH), Respondent.**

**No. 72–1151.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1972.

Decided Feb. 21, 1973.

Joseph A. Oertel, Atty., N. L. R. B., Washington, D. C., for petitioner.

Frank B. Wolfe, III, Tulsa, Okl., for respondent.

Before MATTHES, Chief Judge, MEHAFFY, Circuit Judge, and VAN PELT, Senior District Judge.*

VAN PELT, Senior District Judge.

This case involves an application by the National Labor Relations Board [Board] pursuant to § 10(e) of the National Labor Relations Act [Act] for enforcement of its August 10, 1971 order issued against the Skelly Oil Co. [Employer]. The Board found that the Employer had violated § 8(a)(5) and (1) of the Act by refusing to negotiate with the Automotive, Petroleum and Allied Industries, Local No. 552 [Union] on request after the Union was certified as exclusive bargaining agent. The order required that the Employer (1) cease and desist from refusing to bargain collectively with the Union and from interfering with, restraining or coercing employees in the exercise of their rights under the Act; (2) bargain on request with the Union and post appropriate notices.

The representative election in question was held on November 12, 1969. Twelve employees voted for the Union, nine voted against, with one vote challenged. The challenge was unresolved. On November 18, 1969, the Employer filed timely objections alleging that agents of the Union (1) were engaged in electioneering activities in and about the polling place, and (2) had made certain material misrepresentations to employees.

An investigation of these objections was conducted under the direction and supervision of the Regional Director. Witnesses named by Employer's counsel as possessing information on the alleged objectionable conduct were interviewed and affidavits obtained. In addition, the other persons in the voting unit were interviewed and affidavits were obtained from all but one of the employees who voted in the election.

* Senior District Judge for the District of Nebraska sitting by designation.

The Regional Director made the following findings: Truckdriver Walter Duffy, a son-in-law of Union representative McGinness, was a Union supporter. He had been a Union observer in prior elections, and was considered for such a position in the election in question. [There is a conflict as to whether Duffy was chosen observer and then replaced when he arrived late or whether he was considered for the post and then someone else chosen when Duffy was found to be unavailable.] On the eve of the election a rumor began that a new employee had been hired at a rate of $3.30 or $3.35 per hour, whereas the normal starting rate was $2.72 per hour. [It was unclear as to who started this rumor.] Duffy admitted that on the morning of the election he talked to two other employees at a drinking fountain near the polling booth, asked them what they were making, and when they refused to tell him, stated that the Employer had hired a "new boy" at $3.30 or $3.35 per hour; one of the employees did not recall talking to Duffy, but had heard this rumor. A branch manager of Employer claimed that on the night preceding the election Duffy had used the truck radio to solicit attendance by another employee at a Union meeting; Duffy and the employee denied this. [The Regional Director did not resolve the issue of credibility saying even if the event occurred he "would be unable to conclude that this activity would make Duffy an agent of the Union."]

There was a claim that this rumor was disseminated at a Union meeting prior to the election. The Director found that there had been such a meeting attended by seven employees, all of whom gave affidavits. Of these, two stated that the subject was brought up in a "bull session" before McGinness, who was to conduct the meeting, arrived; two did not hear the subject mentioned at the meeting; two did not recall when the subject was brought up; and one employee stated that McGinness was present but had told the men that there was no way anyone could prove what the new man was making. McGinness could not recall who brought the subject up and Mayo, another Union representative, could not remember it being discussed.

In regard to the contention that the misrepresentation of such a material fact (wages), regardless of the responsibility therefor, had a significant impact on the election and prevented the employees from exercising an uncoerced or free choice, the Director considered the affidavits of the employees who had voted and their statements concerning their knowledge of the rumor and its effect on their vote.

C. B. Gallant, labor relations manager for the Employer, and Employee A stated that Employee A told Gallant that Employee B had called him prior to the election and told him that he (Employee B) was angry concerning the wage rumor and was unsure whether he would vote for the Union or not. Employee A told him that he should make up his own mind about whether to vote, but that the $3.35 wage did not make sense to him and he did not believe it. Employee B then stated that he was new and things were so confused that maybe he should stay out of the election. Employee A also stated that he learned from an assistant branch manager, before election day,[1] that the rumor was untrue and so informed Employee B. Employee B denied having heard the rumor and stated that while he did not vote in the election nothing prevented him from voting.

Richard Reece, a branch manager, stated that on November 20, 1969, he talked to Employee C and C told him he guessed Reece knew he had voted for the Union. After Reece told C that that was his business, C replied that he was mad at the time but was feeling better. Reece stated that he later found out C had talked to C. B. Gallant about the wage rumor. Gallant stated that on November 20, 1969, he asked C if he had

---

1. The Director noted that this conflicts with the Employer's position that it did not hear of the rumor until after the election.

heard the rumor about the wage rate, and C told him he had heard about it at the Union meeting the night before the election, and there was considerable unhappiness about paying a new man more than the other men were getting. C stated that Gallant had talked to him after the election and asked if he had heard about the $3.30 per hour rate. C said he told Gallant he had heard about it the night before the election.

Glen Fortney, assistant branch manager, stated that shortly after the vote had ended Employee D asked why the Employer would hire somebody at $3.30 per hour, and that Employee E joined in and asked, "What is the [Employer] doing trying to get the Union in?" Employee E told him that the men at one of the stores were talking about the man being hired at $3.30 per hour. Fortney then called Reece, found that the rumor was untrue, and informed the men. Both Employee D and Employee E stated that they did not hear the rumor until after they had voted.

Of the ten employees who testified that they heard the rumor prior to the election, nine stated the rumor did not influence their vote. One employee was not interrogated concerning his subjective feelings by the Board and did not volunteer any subjective feelings concerning the rumor.

In view of this evidence, the Director made the following findings: (1) ". . . I am unable to conclude that the evidence establishes that Duffy was an agent of the Union for any purpose. Hence, the Board's rationale as set forth in *Star Expansion Industries Corporation* . . . does not apply to the instant matter . . . ." (2) ". . . I conclude that the evidence does not establish that Union representatives or agents disseminated the misrepresentation at the Union meeting held the night before the election, and hence the Union cannot be held responsible for disseminating the misrepresentation. The Union did nothing to give credence to the rumor or further its circulation. Rather, the Union's business agent, McGinness, sought to dispel the rumor by stating at the Union meeting that the alleged starting rate for the new employee could not be proved." (3) ". . . I find that the misrepresentation in the instant matter does not constitute grounds to set aside the election under either the Board's customary test or the Court's test concerning employees' subjective reactions. Where misrepresentation emanates, as here, from employees who are obviously not in possession of intimate knowledge of the true facts, less significance will be attached to the misrepresentation in evaluating its probable impact on the election."

Therefore, the Regional Director recommended that the objections be overruled and that the Union be certified.

Pursuant to 29 C.F.R. § 102.69(c), the Employer filed exceptions to the Regional Director's report with the Board. The Board adopted the Regional Director's findings and recommendations, and thereby certified the Union pursuant to § 9(d) of the Act.[2]

The Employer refused to bargain with the certified representative and on April 20, 1971, the Regional Director commenced a § 10 unfair labor practice proceeding against the Employer, alleging violations of §§ 8(a)(1) and 8(a)(5) due to the refusal to bargain.[3] The proceeding was transferred to the Board and, on a motion for summary judgment, a notice to show cause why summary judgment should not be granted was issued.

2. The Board held that "the Employer's exceptions to the Regional Director's recommendation that the objections be overruled raise no material or substantial issue of fact or law which would warrant reversal of the Regional Director's findings or recommendations, or which would require a hearing."

3. In cases such as these, an employer wishing to obtain judicial review of a § 9 representation determination, a non-final order, must refuse to bargain with the representative it considers as incorrectly certified and then litigate a subsequent cease-and-desist final order issued pursuant to § 10.

The Board followed its own rule that representation questions decided in a prior § 9 proceeding could not be relitigated in a subsequent unfair labor practice proceeding,[4] and granted the motion for summary judgment. This enforcement proceeding followed.

In General Shoe Corp., 77 N.L.R.B. 124, 127 (1948), the Board expressed the "laboratory conditions" test for consideration of election proceedings: "In election proceedings, it is the Board's function to provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." In order to measure any particular factual situation against this standard the Board uses an objective test. "[The test is whether a misrepresentation] may reasonably be expected to have a significant impact on the election . . . ." Hollywood Ceramics Co., 140 NLRB 221, 224 (1962). Less weight is given to conduct which is attributable to neither party; Orleans Manufacturing Co., 120 NLRB 630 (1958); and, in such a case, the election will not be set aside unless this conduct "created a general atmosphere of fear and confusion which precluded the holding of a free election." James Lees & Sons Co., 130 NLRB 290 (1961).

■■ It is settled law that a party seeking to overturn a representation election has the burden of showing that the election was unfairly conducted. NLRB v. Mattison Machine Works, 365 U.S. 123, 81 S.Ct. 434, 5 L.Ed.2d 455 (1961). On a petition for enforcement this court is limited to determining "whether a Board finding of fact, based on inference or otherwise, is supported by substantial evidence, when viewed on the record as a whole." NLRB v. Century Broadcasting Corp., 419 F.2d 771, 779 (8th Cir. 1969). The present record does not, in the view of the court, warrant a determination that the election was invalid and thus should be overturned.

■ However, we must also determine whether substantial and material factual issues existed which should have been considered in a hearing.[5] The instant case is typical of cases in which an unfair labor practice action follows a disputed election certification proceeding under § 9. Rules promulgated by the Board require an investigation if post-election objections are filed. 29 C.F.R. § 102.69(c) (1972). The Regional Director may make an ex parte investigation. If substantial and material factual issues exist, they can be resolved only after a hearing. 29 C.F.R. § 102.69(c) (1972). The objector must supply the Board with evidence establishing a prima facie case for overturning the election. NLRB v. Bata Shoe Co., 377 F.2d 821 (4th Cir.) cert. denied, 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265 (1967). Cf. NLRB v. Griffith Oldsmobile, Inc., 455 F.2d 867 (8th Cir. 1972). If, after the investigation, the Regional Director recommends certification without a hearing, and the Board finds that the Employer raises no material or substantial issues of fact or law warranting reversal or a hearing, further consideration of an Employer's objections is foreclosed. This is the product of the Board's non-relitigation rule[6] and, although such a rule is not unacceptable, a challenge to certification by refusing to bargain leads inexorably to the finding that there has been an unfair labor practice and to a cease-and-desist order.[7]

4. 29 C.F.R. § 102.67(f); see Pittsburgh Plate Glass Co. v. NLRB, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941).

5. Whether such issues exist is a question of law properly determined, ultimately, by the court. NLRB v. Bata Shoe Co., 377 F.2d 821 (4th Cir.), cert. denied, 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265 (1967).

6. 29 C.F.R. §§ 102.67(f), 102.69(c) (1972).

7. The effects of the non-relitigation rule in this area have been discussed more fully in Home Town Foods, Inc. v. NLRB, 416 F.2d 392 (5th Cir. 1969) and Pepsi-Cola Buffalo Bottling Co. v. NLRB, 409 F.2d 676 (2d Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 219, 24 L. Ed.2d 181 (1969).

Thus, here, although there has been a series of procedural steps involved in the § 10 proceedings, the Board's order was the inevitable by-product of the original § 9 proceeding.[8]

■■ Unfortunately, in the instant case this typical procedure has resulted in a somewhat ambiguous factual background. In our opinion, the objections and investigation lead to the conclusion that substantial and material factual issues existed necessitating a hearing.[9] Failure to grant a hearing under such circumstances can be reviewed and corrected in enforcement proceedings. *Cf.* NLRB v. DITMCO, 428 F.2d 775 (8th Cir. 1970).

There are several factors leading to this decision. First, the issue of Duffy's status was not explored fully and yet was obviously quite important.[10] The Employer did offer evidence which is suggestive of the conclusion that the Union should be held accountable, on the basis of agency principles, for the conduct of Duffy. Duffy was the son-in-law of a Union representative active in the campaign and was himself not only a supporter of the Union but on two previous occasions had been appointed Union observer; in addition, he was at least considered for such a role in the election involved here. The Employer's assertion that Duffy had engaged in unauthorized use of the radio equipment in a Company vehicle in order to urge attendance at a Union meeting, if true, would also be supportive of an agency interpretation. Although Duffy was not acting in an official Union capacity, this would not be a necessary predicate to a finding of agency.[11] Moreover, it is clear from the record that certain of the employees who heard the rumor were simply not capable of evaluating it; therefore, Duffy's status, or apparent status, has significance in the analysis of the effect of his conversation with the two other employees.[12]

---

8. This court does not directly review the § 9 proceeding. Rather, that proceeding is a part of the unfair labor practice proceeding record and the entire record is before the court. Pittsburgh Plate Glass Co. v. NLRB, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941).

9. There is no issue here involving the specificity of objections. *See* United States Rubber Co. v. NLRB, 373 F.2d 602 (5th Cir. 1967). The Employer also has met the standard enunciated by this court in NLRB v. Griffith Oldsmobile, Inc., 455 F.2d 867 (8th Cir. 1972), for the Employer questions not only the findings and inferences reached by the Regional Director, but also asserts the necessity for further factual development of (1) Duffy's status, (2) the events at the pre-election Union meeting, (3) the effect of the rumor, and (4) the time at which the Employer became aware of the rumor. *See* NLRB v. Commercial Letter, Inc., 455 F.2d 109 (8th Cir. 1972).

10. Indeed, the Board has held that "conversations between a *party* and voters while the latter are *in a polling area awaiting to vote* will normally, upon the filing of proper objections, be deemed prejudicial without investigation into the content of the remarks." Milchem, Inc., 170 NLRB 362 (1968) (Emphasis added). Here the Regional Director did not determine whether the conversation at the water fountain was "in a polling area" because he held that Duffy could in no sense be considered a "party."

11. NLRB v. Local No. 3, 467 F.2d 1158 (2d Cir. 1972) ; NLRB v. International Van Lines, 448 F.2d 905 (9th Cir. 1971) (dictum), cert. granted, 405 U.S. 953, 92 S.Ct. 1177, 31 L.Ed.2d 230 (1972) ; Star Expansion Industries Corp., 170 NLRB 364 (1968).

12. In Hollywood Ceramics Co., 140 NLRB 221, 223 (1962), the Board stated: "It is obvious that when employees cast their ballots upon the basis of a material misrepresentation, such vote cannot reflect their uninhibited desires, and they have not exercised the kind of choice envisaged by the Act." It is immaterial whether or not the misrepresentation was intentional. Ipsen Industries, 180 NLRB 412 (1969). Nor is it to be doubted that the subject of wages could be considered material. *Cf.* NLRB v. Commercial Letter, Inc., 455 F.2d 109 (8th Cir. 1972) ; NLRB v. Houston Chronicle Publishing Co., 300 F.2d 273 (5th Cir. 1962). The fact that Duffy was the son-in-law of the Union representative would tend to make even a false rumor circulated by him more believable than if circulated by someone who had no such family connection. We have doubt as to whether the Board correctly evaluated the effect on the election of the son-in-law's statements.

■ Second, even if the agency issue were to be resolved against the Employer, the facts as they appear to this court raise certain questions as to the validity of the election either under the Board's objective test or under a subjective test which would rely upon evidence of the subjective reaction of employees who were exposed to a misrepresentation prior to an election.[13] Adequate factual development is essential in order to measure the events in any election against the "laboratory conditions" standard announced by the Board in *General Shoe*. Even if less weight is given to non-party conduct, the atmosphere in which the election is held must be as ideal as the situation allows, and if free choice is inhibited the election cannot stand. Diamond State Poultry Co., 107 NLRB 3 (1953). The result of the election in the instant case was twelve votes for the Union, nine votes against, with one vote challenged but unresolved. The Board evidently concedes that one vote, that of Employee C, was affected by the rumor. Therefore, the very closeness of the election must be considered. *Cf*. NLRB v. Overland Hauling Inc., 461 F.2d 944 (5th Cir. 1972). Ten employees heard the rumor before voting. There was evidence that employees who heard the rumor after the voting were quite angry, and there was a possibility that one employee did not vote because the rumor confused him. It is apparent that a hearing in which these facts were more fully explored, especially with the opportunity for cross-examination, would assist in the process of determining the validity of the election.[14]

■ This opinion has been reexamined in the light of NLRB v. Southern

Paper Box Company, which was returned to the Board for a factual hearing, and NLRB v. Georgia-Pacific Corporation, in which the Board's order was enforced, both decided January 31, 1973 in this court. The two opinions are consistent with each other and with this opinion. We feel, to paraphrase a quotation contained in the *Southern Paper Box Company* case, that if non-party misconduct has taken place and created an atmosphere in which a free expression of choice is impossible, the representative election should be set aside. It is reasonable to believe that upon giving further consideration to the evidence, such will be the conclusion as to the election here involved.

We therefore deny enforcement and return the matter to the Board for an evidentiary hearing.

---

13. See Home Town Foods, Inc. v. NLRB, 416 F.2d 392 (5th Cir. 1969).

14. In making such a determination both objective and subjective evidence should be considered. As the court noted in NLRB v. Smith Industries, Inc., 403 F.2d 889 (5th Cir. 1968): "[T]he problem in these representation proceedings is that we are dealing with the elusive concept of the subjective effect of objective union conduct on 'the minds of the voters,' and subjective as well as objective evidence may be sufficient to overturn the election. . . . An evaluation of the historic facts, without an inquiry into the surrounding circumstances, without viewing those facts cumulatively, and without an opportunity to directly observe and examine witnesses, may lead to erroneous legal conclusions." *Id*. at 895.