**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The LORD BALTIMORE PRESS, INC., Respondent.**

**No. 18136.**

United States Court of Appeals Eighth Circuit.

Dec. 28, 1966.

Glen M. Bendixsen, Atty., N. L. R. B., Washington, D. C., for petitioner. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Clarice R. Feldman, Atty., N. L. R. B., Washington, D. C., were with him on the brief.

Richard F. Watt, of Cotton, Watt, Rockler & Jones, Chicago, Ill., for Lithographers and PhotoEngravers International Union, AFL–CIO. Eugene Cotton and David R. Kentoff, of Cotton, Watt, Rockler & Jones, Chicago, Ill., were with him on the brief.

Willis S. Ryza, of Pope, Ballard, Uriell, Kennedy, Shepard & Fowle, Chicago, Ill., for Lord Baltimore Press, Inc. James G. Davis, Chicago, Ill., and John R. Stockham, St. Louis, Mo., were with him on the brief.

Before JOHNSEN, Senior Circuit Judge, BLACKMUN, Circuit Judge, and YOUNG, District Judge.

JOHNSEN, Senior Circuit Judge.

The National Labor Relations Board has petitioned for enforcement of its order, 151 NLRB No. 30, which requires respondent, The Lord Baltimore Press, Inc., to bargain collectively with Local 90, Amalgamated Lithographers of America [herein Lithographers] as the exclusive bargaining representative for the group of employees in its plant at Clinton, Iowa, who performed lithographic work and the incidents thereof.[1]

Respondent, a Maryland corporation, has several plants throughout the country. Its Clinton plant is engaged in the production of folding cartons. Lithographic work is done on approximately 55% of the carton output. On another 40%, rotogravure work is done. These distinct printing processes are performed by two different groups of employees. There also is a small volume of cartons [5% according to the Board's finding] on which letterpress work (ordinary printing) is done, but this is of minor and apparently diminishing aspect; does not constitute a continuous operation; and is taken care of by some of the lithographic group as occasion requires. The handling of this incidental letterpress work is without significance on the contentions urged in resistance to the Board's petition here.[2]

The lithographic group was comprised of 58 employees, out of a total of 289 production and maintenance workers in the plant. There were 31 other employees who were not engaged in production and maintenance work. For over two years prior to the Board's certification of Lith-

ographers, all of the production and maintenance workers had been represented by Clinton Printing Specialties and Paper Products Union, Local 711, AFL–CIO [herein Printing Specialties Union], as a plant-wide bargaining unit; and a collective bargaining agreement had been entered into on this over-all basis between it and respondent.[3]

Severance of the lithographic group from the plant-wide unit was brought about through the filing of a petition by Lithographers for a representation election as to the group on its craft nature; the holding of a hearing as to the appropriateness of the lithographic employees having a separate bargaining unit, if they so desired; a determination by the Board of the appropriateness thereof in the situation involved; the conducting of an election among the lithographic employees as to their choice between the craft unit or the plant-wide unit, with a majority voting in favor of representation by Lithographers; and the certifying of Lithographers by the Board as exclusive bargaining representative for the group.

At the hearing on the representation petition, respondent had challenged the appropriateness of such a separate bargaining unit as against the existing plant-wide unit, on the basis both of its own production operations and of the plant-wide pattern alleged to exist establishedly in the folding-carton industry generally. Further, after the representation election had been held, respondent had lodged written complaint against the electioneering conduct in which Lithographers had engaged, charging it with having resorted to malicious falsehood intended and serving to improperly prejudice the minds of the lithographic em-

---

1. The Board's order made specification of the work tasks or jobs involved in the craft unit.

2. In its Decision and Direction of Election, 144 NLRB No. 134, the Board found that "none of Employer's employees are presently classified as letterpress employees"; and respondent's brief admits that no formal distinction is made at the Clinton

plant "between the employees who operate both letterpress and offset [lithographic] equipment and those who operate only the offset equipment".

3. Printing Specialities Union had been recognized as the plant-wide bargaining unit by respondent without a representation election or certification by the Board.

ployees against the existing representation setup; requesting a hearing to present proof of the facts alleged in the complaint; and attempting thus to have the election set aside. Initially the Regional Director, and thereafter the Board, refused to grant any hearing on the complaint.

It was for the purpose of obtaining a judicial review of the questions above indicated—(1) appropriateness of the separate bargaining unit as held by the Board's representation decision, and (2) arbitrariness in the Board's refusal to grant a hearing as to the election conduct —that respondent refused to recognize Lithographers as bargaining representative and thereby allowed itself to become subject to charge of unfair labor practice under § 8(a) (5) and (1) of the Act. 29 U.S.C.A. § 158(a) (5) and (1), and to issuance of the order which the Board is here seeking to have enforced.

The questions of "inappropriateness of the bargaining unit, improper conduct of the election, or any other matter relating to the validity of the certification" remained open to the Board in the § 8(a) (5) and (1) proceeding; and its action in respect to them was therefore available to respondent on arbitrariness and capriciousness in a judicial review of the bargaining order entered in the proceeding. S. D. Warren Co. v. N. L. R. B., 353 F.2d 494, 496 (1 Cir., 1965); Pittsburgh Plate Glass Co. v. N. L. R. B., 313 U.S. 146, 154, 61 S.Ct. 908, 913, 85 L.Ed. 1251 (1941).

As to the first question presented, we think it cannot be held that such inappropriateness of separate bargaining unit in the situation has been shown as to make the Board's representation decision arbitrary and capricious.

The Act provides that "The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or division thereof * * *".

§ 9(b), 29 U.S.C.A. § 159(b). This indication of the consideration by which the Board is primarily to be guided, together with the omission from the Act of any provision for a delaying direct review of the resolution made in a particular situation, would seem to imply a legislative expectation and intent that the Board's decision on appropriateness should be virtually final. Since, however, there is not an express preclusion on finality, the door is, of course, not wholly closed to judicial scrutiny, but within the channel of such scrutiny as is thus entitled to be made, this must inherently be confined to the matter of manifest legal abuse, from a lack of official responsibility being involved or a fundamental unfairness being committed.

Thus the Supreme Court has said: "Section 9(b) of the Act confers upon the Board a broad discretion to determine appropriate units. * * * It involves of necessity a large measure of informed discretion and the decision of the Board, if not final, is rarely to be disturbed". Packard Motor Car Co. v. N. L. R. B., 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947). See also Marshall Field & Co. v. N. L. R. B., 135 F.2d 391, 394 (7 Cir., 1943) [Board's decision entitled "to almost complete finality"]; N. L. R. B. v. Hurley Co., 310 F.2d 158, 161 (8 Cir., 1962) [Decision final "unless it appears that the Board acted in a capricious or arbitrary manner"].

Within this scope of scrutiny, respondent's contention of inappropriateness and of administrative abuse on the basis thereof does not require extensive discussion. While the lithographic work represented one of the processes that regularly went into the normal production flow of a part of respondent's carton volume [55%, plus the 5% involving uncontinuous letterpress work also handled by some of the lithographic employees], the Board evaluated this as neither of itself nor in plant relationship causing respondent's production to constitute a highly integrated process.

The Board made finding that "it is clear that the plant could operate effectively, even though the lithographic section was not in use". It pointed out indicatively that the record showed that during a period of time in which two of the three offset presses had been unable to be used, the production of the plant had not been materially affected. And such adjustment as may have been engaged in during that period as to normal production scheme would rationally seem to be also temporarily possible in respect to any separate strike that might occur from having a lithographic unit.

Further, there was the operational fact, previously mentioned, that 40% of respondent's cartons did not at all involve lithographic process but rotogravure process, so that a strike by the lithographic group would not per se put an end to all plant production, nor could it even be said that it would leave the plant with basis merely of unsubstantial carton production.

Passing to the further aspect of respondent's contention on inappropriateness—that there existed such an established pattern of plant-wide bargaining in the folding-carton industry as to make it arbitrary for the Board not to accord recognition precludingly to this industrial uniformity—the Board made probative appraisal that "there is a paucity of evidence in the record upon which to premise an affirmative finding to that effect." The Board could properly view the testimony relating to this aspect as not being of such weight and scope as to persuade of the existence, as a fact, of a general industry pattern—in whatever responsibility there might be to take such an industrial pattern into account as a factor on appropriateness in relation to individual folding-carton plant. Here, in addition to the testimony being capable

of regarded as not being certain or satisfactory that all the plants purportedly dealt with by the witness constituted folding-carton factories in industrial classification, the testimony itself had relation to only approximately one-third of the plants at most, which seemingly could comprise the industry.

With the Board's findings thus entitled to be viewed as not being without rational basis—that no such highly integrated production process existed and no such general industry bargaining pattern had been established as to require recognition —the question of appropriateness calls for simply a word in respect to the craft recognition made. On this it is enough to say that the record afforded ample basis for the Board to regard the plant's lithographic work and employees as coming within the skills, techniques, ties, and interests which it has long recognized as characterizing the lithographic field, and on the basis of which it has held such employees of plants in varying industrial categories to constitute "a cohesive group appropriate for purposes of collective bargaining".[4]

All of the foregoing further leaves without any basis respondent's remaining contention that in granting such a craft severance in the folding-carton industry the Board was applying a different standard and policy than that which it had declared as to the basic-steel, wet-milling, lumber and basic-aluminum industries,[5] and so was engaging in improper administrative discrimination. In the four industries mentioned, the Board has consistently refused to give consideration to any separate craft as against the plant-wide bargaining setup existing generally therein. It has, however, announced that it will not make application of this policy to any other than these four industries.[6]

4. An appendix to the brief filed by Lithographers as intervenor lists over 200 cases in which through a period of some 20 years the Board has given recognition to lithographic bargaining units in industrial plants of sundry products-nature.

5. See National Tube Co., 76 NLRB 1199 (1948) [basic-steel]; Corn Products Refining Co., 80 NLRB 362 (1948) [wet-milling]; Weyerhaeuser Timber Co., 87 NLRB 1076 (1949) [lumber]; Permanente Metals Corp., 89 NLRB 804 (1950) [basic-aluminum].

6. See American Potash & Chemical Co., 107 NLRB 1418 (1954).

N. L. R. B. v. Pittsburgh Plate Glass Co., 270 F.2d 167 (4 Cir., 1959) gave consideration to the propriety of this difference in treatment of these four integrated industries and of other equally integrated industries, and held that in refusing to apply its four-industry policy to the plate glass industry, where "precisely the same conditions exist",[7] the Board was guilty of arbitrariness, in that it was engaging in discriminatory administration of the Act.

But the *Pittsburgh Plate Glass* holding is without any application here. The Board's representation decision was not as in *Pittsburgh Plate Glass* predicated upon its *American Potash* doctrine, supra, footnote 6 herein, but upon its appraisal and finding, noted above, of the lack of highly integrated plant-operation and of established bargaining-pattern in the folding-carton industry, such as would in any event be necessary to provide basis for any argument as to the *National Tube, Corn Products, Weyerhaeuser Timber* and *Permanente Metals* cases, supra, footnote 5 herein. The present situation is akin to that in N. L. R. B. v. Weyerhaeuser Co., 276 F.2d 865 (7 Cir., 1960), where the Board's severance of the lithographic employees from the plant-wide bargaining unit in a folding-carton industry was upheld and the petition for enforcement granted, on the basis of the Board's findings, as here, of lack of precluding integration in either plant situation or industry pattern.

In light of our preceding holdings, we summarily dispose of, as being without merit, respondent's residual contention that the Board's findings on lack of productional integration and of bargaining history were not sufficiently detailed to enable review to be made of the Board's representation decision.

█ This leaves only the question of the propriety of the Board's denial of respondent's request for a hearing on Lithographers electioneering conduct. As to this, we are of the opinion that, from the nature of the statements alleged to have been falsely made, the purpose for which they apparently were engaged in, and the capacity which they ostensibly could have to produce incensed reaction in the election situation, a hearing and an appraisal by the Board was called for as to whether it was possible for improperly influenced voting expression to have been involved.

We do not believe it could be said out-of-hand, as the Board in effect did by making summary denial of respondent's request for a hearing, that the lithographic-employees' vote for Lithographers represented an uninhibited expression on their part in favor of representation by Lithographers and against the existing representation by Printing Specialties Union, without any motivating impact having been produced by the allegedly false statements made in two pre-election meetings by the Lithographers official who had charge of the election campaign.

The Board, with expressional sensitiveness as to such an election situation, has said that "It is obvious that when employees cast their ballots upon the basis of a material misrepresentation, such vote cannot reflect their uninhibited desires, and they have not exercised the kind of choice envisaged by the Act". Hollywood Ceramics Co., 140 NLRB 221, 223 (1962). It should hardly need saying that this no less applies to material misrepresentation by a union than by an employer.

The situation here was one in which Lithographers petition and campaign for representation had been preceded by a filing of charges with the Board that respondent had improperly recognized Printing Specialties Union as bargaining representative in the plant and that it had discriminatorily discharged a lithographic employee named Neneman, who

---

7. "But precisely the same conditions exist in the plate glass industry, with which we are now concerned, since it is as much if not more integrated than those in the fa-vored group and has an unbroken history of plantwide bargaining". 270 F.2d at 174.

was a Lithographers partisan. Each of these charges was held by the Board's Regional Office, after purported investigation, to be without merit, and issuance of complaints thereon was refused.

At the two pre-election meetings referred to, the Lithographers official allegedly made the accusation that respondent had gotten both of the charges filed by it suppressed by bribery of ["had bought off"] the Regional Office representative by whom the matters were handled. The electioneering significance of this would naturally lie in its thrust at the integrity of the employer in respect to its labor relations and the shadow which this would cast upon the existing representation setup. It seems only reasonable to suppose that it was designed to and would arouse concern about why respondent would go so far as to engage in bribery to stifle any airing of its recognition of Printing Specialties Union and its discharge of Neneman, the Lithographers partisan.

The Board had showing before it that the Lithographers official had further said at one of the meetings that "If (the Regional Office's representative) hadn't been bought off (Lithographers) wouldn't be having so much trouble getting into the plant". And the alleged suppression of airing of Neneman's discharge was apparently deemed to be of such significance in the election situation that Lithographers brought him back to Clinton for participation in the campaign and attendance at the employees' meetings. Enough reaction seems to have been created as to this aspect of the asserted bribery that at one of the meetings an employee was alleged to have exclaimed that, "If it weren't for the trumped-up charges against John Neneman, he would still be working here". Moreover, showing also was before the

Board that the asserted buying-off of the Board's representative had been the subject of comment among the employees at their work.

Lithographers' accusation as to how suppression of the charges made by it against respondent had been accomplished was alleged by respondent to be a deliberate and malicious falsehood.[8]

Within the standard declared by the Board in Hollywood Ceramics Co., supra, 140 NLRB at 224, that the test is whether a misrepresentation "may reasonably be expected to have a significant impact on the election", we think the Board could not abstractly hold that the allegedly false accusations made were not reasonably capable of having any significant impact on the employees' voting. The Board therefore was not entitled to make summary denial of respondent's request for a hearing.

We agree with N. L. R. B. v. Trancoa Chemical Corp., 303 F.2d 456, 461, 3 A.L.R.2d 879 (1 Cir., 1962), that a resort to deliberate falsehood or intentional fraud, as is alleged to have existed here, will generally be a matter of significance in a representation election, for as Judge Aldrich there expressed it, "No one is in a better position than the union to know what the voters need to be told". Also, as he concludingly observed (p. 462): "The Board * * * asserts [as it also did here] that it does not 'condone' untruthfulness, but standards will be set by what it does, not by what it says".

Enforcement of the Board's order will be denied, but without prejudice to a renewal of the petition, should it be found and be entitled to be found, on appropriate hearing, that Lithographers' alleged misconduct could not have had any significant impact on the election.

Petition for enforcement denied.

8. The significance which the Lithographers official regarded his accusation as having would seem to be reflected in his repetition of it to respondent's officers the evening preceding the election, after he had made a futile last-minute attempt to get them to enter into a contract with him. At that time, he charged that the

Board's representative had left Clinton with a new Oldsmobile and made reference to respondent's recognition of Printing Specialties Union as a "yellow-dog" relationship. A fanning of such expressions and implications into an election campaign could hardly be said to be for innocuous purpose or of innocuous effect.