**LaCRESCENT CONSTANT CARE CENTER, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 74–1468.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1974.

Decided Feb. 19, 1975.

R. Walter Bachman, Jr., Minneapolis, Minn., for petitioner.

Stephen Quinn, Atty., N.L.R.B., Washington, D. C., for respondent.

Before LAY and BRIGHT, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

This case is before us on the petition of LaCrescent Constant Care Center, Inc. (Company) to set aside an order of the National Labor Relations Board requiring it to bargain with the Minnesota Council # 65, American Federation of State, County and Municipal Employees, AFL–CIO (Union). The Board cross-petitions for enforcement of its order.[1] The Company urges that its refusal to bargain is justified because the Board's certification of the Union is invalid. It asserts that the representation election upon which the certification is based was tainted by material misrepresentations made by a Union organizer, Mr. Roth, during the election campaign. We agree and decline enforcement.

The Company is a Minnesota corporation which operates a proprietary nurs-

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. The Board's decision and order are reported at 211 N.L.R.B. No. 72 (1974).

ing home in LaCrescent, Minnesota. On June 5, 1973 the Union won a Board-conducted consent election by a vote of twenty-six to twelve with no void or challenged ballots.[2] The Company filed timely objections to the conduct of the election, asserting that the Union had so misrepresented its financial condition to the employees as to preclude the free choice of a bargaining agent.[3]

The Acting Regional Director made an investigation and found evidence that Roth had made misrepresentations to the employees. These pertained to the Company's profit position and hence bore directly upon its repeated assertions to its employees that it could not pay higher wages because it was losing money. The truth was, as the Director found, that "in fiscal 1972, the employer actually suffered a loss." He concluded, however, that "the employees were in a position to independently evaluate Roth's statement. In addition, I am not convinced that the alleged misrepresentation was so substantial as to warrant setting aside an election. * * * I ·

therefore find that the alleged misrepresentation, if made, did not affect the results of the election." [4]

Again the Company filed exceptions; their principal thrust, as before, was directed towards the "false statements" made by the Union organizer to the effect that the Company was making a "substantial, even excessive, profit," and that a Minnesota court had denied relief to the Company in a welfare lawsuit because of excessive profits. The exceptions also attacked the Director's conclusion that the employees were in a position to "independently evaluate" the Union statements.

The Board, however, with Member Kennedy dissenting, rejected the objections made, adopted the Acting Regional Director's Report and found · that the Company's exceptions "raise no material issues of fact or law which would warrant the holding of a hearing or reversing the findings, conclusions, and recommendations of the Acting Regional Director." It thereupon certified the Union as the bargaining agent.[5]

2. There were approximately forty-four eligible voters in the appropriate unit consisting of:

> All full time and regular part time nurses aides, housekeeping employees, laundry employees, dietary employees, social activities aide, orderlies and maintenance employees; excluding casual employees, temporary employees, confidential employees, LPN's, RN's, guards, and supervisors as defined in the National Labor Relations Act as amended.

3. In more detail LaCrescent's objections asserted:

> 1. Petitioner Union, and agents and employees of said Union, misstated material facts during the conduct of the election. A central issue during the election was the past, present, and future ability of the employer to afford pay increases, given an 18 month "freeze" in the level of reimbursement for the care of welfare patients payable to the employer by the Houston County Welfare Board and Minnesota Department of Public Welfare. Petitioner Union grossly distorted the facts relating to the past, present, and future ability of the employer to receive increased reimbursement from welfare agencies and, hence, the ability of said employer to allow employee wage increases.

> 2. Petitioner Union, and agents and employees thereof, grossly misrepresented the nature, judgment, and reasons for judgment in a major lawsuit in which the employer sought additional reimbursement for the care of welfare patients from Minnesota Welfare agencies, thereby misstating the past, present, and future abilities of the employer to grant increased wages to members of the bargaining unit.
> 3. Petitioner Union, and agents and employees thereof, otherwise misstated the financial standing and status of the employer so as to induce members of the bargaining unit to believe that the employer was "profiteering" at the expense of members of the bargaining unit.

The employer hereby formally objects to the above-stated misconduct which affected the results of the election herein * * *.

4. The finding assumes that the testimony of employee witnesses as to Roth's statements that the Company had lost its lawsuit because it was making "too much money" was accurate. *See,* respecting the situation where all the facts contended for by the challenging party are given credence, NLRB v. Commercial Letter, Inc., 455 F.2d 109, 115 (8th Cir. 1972) (Lay, J., concurring) and cases there cited.

5. 208 NLRB No. 9 (1974).

Thereafter, the Company refused to bargain with the Union, and the Board issued a complaint alleging a refusal to bargain in violation of §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5). The Company admitted its refusal to bargain, but contended that it was justified in its refusal because the certification was invalid for the reasons urged in its objections to the election.[6] The Company and the Union entered into a stipulation stating that the Board should "transfer this proceeding to the Board for final determination,"[7] that there were "no issues of fact which would warrant a hearing," and that both parties "waive the right to a hearing before the Administrative Law Judge," the filing of briefs, and other procedural steps.[8]

The cause was thereupon submitted to the Board which granted the General Counsel's motion for summary judgment on the ground that all issues in the case were or could have been litigated in the representation proceeding.[9] This action followed.

■ We recognize that the Board is vested with a wide discretion in dealing with matters relating to representation proceedings.[10] Within this discretion the Board has adopted the following standard concerning preelection propaganda:

We believe that an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election. * * * [E]ven where a misrepresentation is shown to have been substantial, the Board may still refuse to set aside the election if it finds upon consideration of all the circumstances that the statement would not be likely to have had a real impact on the election. For example, the misrepresentation might have occurred in connection with an unimportant matter so that it could only have had a *de minimis* effect. * * * Or, the Board may find that the employees possessed independent knowledge with which to evaluate the statements.

6. "In cases such as these, an employer wishing to obtain judicial review of a § 9 representation determination, a non-final order, must refuse to bargain with the representative it considers as incorrectly certified and then litigate a subsequent cease-and-desist final order issued pursuant to § 10." NLRB v. Skelly Oil Co., 473 F.2d 1079, 1082 n. 3 (8th Cir. 1973). *See* Boire v. Greyhound Corp., 376 U.S. 473, 476–79, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); AFL v. NLRB, 308 U.S. 401, 409, 60 S.Ct. 300, 84 L.Ed. 347 (1940).

7. *See* 29 C.F.R. § 102.50 (1974).

8. The stipulation was clearly intended to expedite the unfair labor practice proceedings, which in this context were merely pro forma. What we said in NLRB v. Skelly Oil Co., 473 F.2d 1079, 1083–84 (8th Cir. 1973) is pertinent here:

If, after the investigation, the Regional Director recommends certification without a hearing, and the Board finds that the Employer raises no material or substantial issues of fact or law warranting reversal or a hearing, further consideration of an Employer's objections is foreclosed. This is the product of the Board's non-relitigation rule [29 C.F.R. §§ 102.67(f), 102.69(c) (1974)] and, although such a rule is not unacceptable, a challenge to certification by refusing to bargain leads inexorably to the finding that there has been an unfair labor practice and to a cease-and-desist order. Thus, here, although there has been a series of procedural steps involved in the § 10 proceedings, the Board's order was the inevitable by-product of the original § 9 proceeding. [footnotes omitted.]

9. 211 NLRB No. 72, at 4–5 (1974).

10. NLRB v. Wyman-Gordon Co., 394 U.S. 759, 767, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); *e. g.* NLRB v. Modine Mfg. Co., 500 F.2d 914, 916 (8th Cir. 1974); NLRB v. Commercial Letter, Inc., 455 F.2d 109, 115 (8th Cir. 1972) (Lay, J., concurring).

The courts have not deferred to this discretion, however, where the Board fails in its "duty * * * to establish 'the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees.'" NLRB v. Savair Mfg. Co., 414 U.S. 270, 276–7, 94 S.Ct. 495, 498, 38 L.Ed.2d 495 (1973).

Hollywood Ceramics, Inc., 140 NLRB 221, 224 (1962) (footnotes omitted).[11]

In the instant case the Board and the Acting Regional Director (whose findings and conclusions the Board adopted) focused on the last part of this test, whether "the statement would * * * be likely to have had a real impact on the election." In this regard the Board found that the Company's memoranda and letters to its employees [12] gave them sufficient independent knowledge to evaluate Roth's misrepresentations, which thus, presumably, had no impact on the election.[13] The Board noted that the Union was not in a special position to know more than the employees about the Company's lawsuit against the Department of Social Welfare.[14] Finally, the Board found that the employees were likely to have sufficient "common judgment" to be able to evaluate Roth's statement to the effect that a subtraction of the Company's out-of-state purchases from gross sales shows sufficient funds left over to pay a wage increase.[15]

The Company does not challenge the *Hollywood Ceramics* standard.[16] Rather, it challenges whether the conclusions reached by the Board in applying its chosen standard are supported by substantial evidence on the record considered as a whole.[17]

■ Our point of departure is clear: the Board does not, generally speaking, police the utterances of the parties to a Union election. It does not insist on the niceties of phraseology one would demand in a deed, and it is not unaware that within the limits of fair electioneering it must expect the voters to be exposed to a puffing of the merits of a proponent's position accompanied by derogation of that of the opponent. *See* Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 82–91 (1964); Fuchs, Pre-election Campaign Propaganda and Activities Before the National Labor Relations Board, 4 B.C.Ind. & Com.L.Rev. 485, 488–89 (1963).

■ However, a point may be reached where the pre-election propagandizing has created an atmosphere rendering the free choice of a bargaining agent by the employees highly improbable. In such event the election must be invalidated. Here it is conceded that the Union organizer made misstatements of fact. They pertained to wages, "the stuff of life for Unions and members, the selfsame subjects concerning which men organize and elect their representatives to bargain." [18] In this situation, where the vigorously contested ability of the Com-

**11.** This court has approved the *Hollywood Ceramics* standard. NLRB v. Modine Mfg. Co., 500 F.2d 914, 915–16 (8th Cir. 1974); NLRB v. Southern Paper Box Co., 473 F.2d 208, 210 (8th Cir. 1973); NLRB v. Georgia-Pacific Corp., 473 F.2d 206, 208 (8th Cir. 1973); *see* NLRB v. Skelly Oil Co., 473 F.2d 1079, 1083 (8th Cir. 1973); NLRB v. Lord Baltimore Press, Inc., 370 F.2d 397, 402 (8th Cir. 1966).

**12.** By memorandum of January 31, 1972 the Company informed its employees that it was suspending all raises because of a state-imposed "freeze" on the level of reimbursement for the care of welfare patients. On June 16, 1972 a letter to all employees (accompanying checks representing partial back pay for such suspended raises) stated that the Company's requests for increased reimbursement from the Department of Public Welfare had been denied. On March 20, 1973 a memorandum informed employees that as a result of a change in Department policy it anticipated the Department to grant increased reimbursement, and that certain employees could ex-

pect a raise. Finally on May 27, 1973 (four days after the meeting here in question) employees received checks for back pay, stated to have been made possible by the receipt of increased reimbursement from the Department.

**13.** 208 NLRB No. 9, at 2 n. 1 (1974) (*semble*).

**14.** *Id.*

**15.** *Id.,* at 3 n. 1.

**16.** *See* notes 10 & 11, *supra.*

**17.** National Labor Relations Act § 10(e), 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 487–88, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *e. g.* NLRB v. Payless Cashway Lumber Store, Inc., 508 F.2d 24 (8th Cir. 1974).

**18.** NLRB v. Houston Chronicle Publishing Co., 300 F.2d 273, 280 (5th Cir. 1962), quoted in Gallenkamp Stores Co. v. NLRB, 402 F.2d 525, 534 (9th Cir. 1968); NLRB v. G. K. Turner Associates, 457 F.2d 484, 488 (9th Cir. 1972).

pany to pay higher wages assumed primary importance in the pre-election campaigning, the misrepresentation found to have been made cannot be regarded as other than material. Under these circumstances our holding in NLRB v. Lord Baltimore Press, Inc., 370 F.2d 397, 402 (8th Cir. 1966) is pertinent to the problem presented:

> [A] resort to deliberate falsehood or intentional fraud, as is alleged to have existed here, will generally be a matter of significance in a representation election, for * * * "No one is in a better position than the union to know what the voters need to be told".

The misrepresentations as to the Company's profit position had two aspects, not unrelated, but with a somewhat different emphasis. The first concerned the general charge that the Company had the money with which to pay a wage increase as shown by the Stipulation for Certification Upon Consent Election. This showed gross sales by the Company of $323,902 and purchases outside of the State of Minnesota in excess of $50,000.[19] Subtracting the jurisdictional figure from the gross, Roth argued that the Company "had over $200,000 to meet additional expenses and must surely have some money left over to pay at least a minimal wage increase." Actually the Company was losing money during this fiscal period, and it charges that Roth's statement amounted to a misrepresentation by the Union of its financial standing. The Board's position was that the " 'nurses aides, housekeeping employees, and laundry employees' [were not] so bereft of common judgment as to be unable to evaluate statements to the effect that by subtracting out-of-state purchases from gross sales shows that sufficient money was left over to pay a minimal wage increase," and that "the employees were well able to determine that the Employer's expenses of operation included more than out-of-state purchases * * *; " in short, that the employees' common sense would warn them that the Roth statement was misleading. 208 NLRB No. 9, at 3 n. 1.[20] We need not, however, determine the degree to which the common sense of an employee may supply the factual information[21] normally deemed essential to a profit and loss determination in view of the fact that the second Roth statement then moved into an area of gross and undeniable misrepresentation.

19. The Board asserts jurisdiction over non-retail operations which have an annual out-of-state inflow or outflow of at least $50,000. R. Smith, L. Merrifield & T. St. Antoine, Labor Relations Law 55 (5th ed. 1974). Its dollar volume standard for asserting jurisdiction over nursing homes is a gross annual revenue of at least $100,000. *Id.* at 57; University Nursing Home, Inc., 168 NLRB 263 (1967). *See* § 14(c)(1) of the National Labor Relations Act, 29 U.S.C. § 164(c)(1).

20. A portion of Member Kennedy's dissent goes to the same point:

> The Acting Regional Director's investigation revealed that the Employer continually communicated to its employees by letter and memoranda that it was attempting to secure additional funds from the Minnesota Department of Public Welfare. He found this created a "clear implication" that the Employer, faced with rising costs, had no funds available for wage increases. He concluded, from this implication, that the employees were in a position to independently evaluate the Petitioner's misrepresentation. Such reasoning is unacceptable to me. The Board has not adopted, and in my estimation should not adopt, a penumbra-like approach to solving preelection misrepresentation questions. It is far fetched to suggest that "nurses aides, housekeeping employees, and laundry employees" would possess the expertise to independently evaluate the Petitioner's misstatements. To conclude that employees would view the statements of the Petitioner's representative as mere innocuous puff is unlikely at best.

> The misrepresentation of the Employer's financial condition, whether or not deliberate, involved an important matter to the voters. The Employer did not have an opportunity to make an effective reply to this misrepresentation. And, of course, any misrepresentation concerning wages cannot be considered trivial.

208 NLRB No. 9, at 5 (1974) (footnotes omitted).

21. The Company's communications offered no factual information concerning its financial status, but merely alleged that its financial status was poor because of the penurious policies of the Department of Social Welfare.

In February of 1972 the Company had filed suit challenging the legality of the statewide freeze of welfare rates in nursing homes. The decision of the court upheld the legality of the welfare rate freeze.[22] The loss of this suit was employed by Roth as an argument supporting his thesis that the Company was well able to pay higher wages. As summarized by the Acting Regional Director:

> Employees' accounts of Roth's statement, however, indicate that Roth told them the Employer had lost its lawsuit because it was making "too much profit" or "too much money" and that it could have won the lawsuit if it had shown a "negative cash flow." Assuming that the testimony of employee witnesses is accurate, Roth's assertion that the Employer had made a profit is a misrepresentation. In fact, the outcome of the lawsuit was in no way based on the Employer's profit or loss. Furthermore, in fiscal year 1972, the Employer actually suffered a loss.

At this point the line has been crossed. We are no longer dealing with puffery, electioneering rhetoric. Here the organizer has either recklessly or deliberately falsified the record.[23] To lend credence to his claim that the Company could well afford a wage increase, Roth invoked the aegis of a court by asserting, in effect, that an impartial judicial authority had determined that the Company was reaping high profits. This was a complete falsehood which cannot be characterized as less than a "substantial departure from the truth" under the *Hollywood Ceramics* test.

Viewing the totality of the circumstances presented, we conclude that the Board's finding that Roth's misrepresentations were not likely to have a significant impact on the election is clearly unsupported by substantial evidence on the record as a whole. Accordingly,

Enforcement of the Board's bargaining order is denied.

---

**22.** LaCrescent Constant Care Center, Inc. v. State, No. 383235 (Minn.2nd Dist.Ct., April 10, 1973).

**23.** The Court's opinion referred to by the Union held that the "provider agreements" executed by the Company required the payment only of "reasonable costs," and that the State of Minnesota from February 1, 1971 through October 31, 1972 had reimbursed the Company on the basis of "reasonable costs;" that the Company's "Notice of Termination" created no new contractual obligations upon the State; that the legislative action reducing appropriations for the Medical Assistance Program for fiscal 1971–1973 required the Minnesota Department of Public Welfare to expend only duly appropriated sums; that the action of the Minnesota Department of Public Welfare imposing a rate freeze upon nursing homes was neither arbitrary nor capricious; and that the Company was entitled to no relief. We find no support in the record or in reason for the Director's conclusion that the employees had independent knowledge by the use of which "they could evaluate Roth's alleged assertion that the Employer had lost its lawsuit because it made a profit."