**ALPERS' JOBBING COMPANY, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 76–1131.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 9, 1976.

Decided Dec. 30, 1976.

Lewis C. Green, St. Louis, Mo., for petitioner.

Carol A. De Deo, Atty., N. L. R. B., Washington D. C., for respondent; John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Sumner David Stone, Atty., N. L. R. B., Washington, D. C., on brief.

Before BRIGHT and WEBSTER, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

BRIGHT, Circuit Judge.

This case comes before the court on the employer's petition to review an order of the National Labor Relations Board directing the employer (Alpers' Jobbing Co.) to bargain collectively with the Union (Teamsters Local 688) and the Board's cross-application for enforcement of its order. The issues presented arise out of an underlying consent election, which was won by the Union. The employer in refusing to bargain contends that a new election must be held because one of a group of three employees who intended to vote against the

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

Union mistakenly marked his ballot in favor of the Union. The unique circumstances surrounding the election indicate that the Board's election procedures may have failed to produce an accurate indication of employee sentiment. Accordingly, we grant the petition for review and deny enforcement of the Board's order.

The election was held on April 4, 1975, on the premises of the employer, Alpers' Jobbing Company. During that election, the Union challenged the votes of three elderly, part-time employees. Sam Melinas, age 69, is unable to read or write English, and has only limited understanding of spoken English, but can read and write in Yiddish. Louis Sacus, age 63, cannot read or write very well and has almost no reading ability without his glasses, which he had left at home on the day of the election. Marshall Dubinsky, age 66, is apparently a somewhat excitable person. He possesses a greater degree of capability with the English language than Melinas and Sacus, but his comprehension of the English language is also limited.

Melinas, Dubinsky, and Sacus each approached Irvin Alper, president of the company, a number of times before the election seeking an explanation of the election ballot and advice on how to vote. Before the election, each of these three expressed a strong desire to vote against the Union. Due to their limited language ability, however, these three men had difficulty understanding and dealing with the ballot to be used in the election. Sharon Sacus, Louis Sacus' granddaughter, who also works at the plant, furnished an affidavit to the Board stating that she had attempted to explain the election process to her grandfather at least three times during the week preceding the election, and that she also had explained the ballot at least once to Marshall Dubinsky and Sam Melinas. She was not sure "if they really understood it or not after I explained it to them."

When Marshall Dubinsky came to the voting area on election day, the Union representative, Kenney Allen, called out in a loud voice, "I challenge him." Dubinsky's reaction was to put up his fists to defend himself, thinking Allen was challenging him to a fight. Melinas was right behind Dubinsky and heard the exchange. The Union observer began to stand up, as if to defend himself against Dubinsky, but the Board agent quieted the parties, saying "Let's keep it quiet and go in there and vote." Allen also vocally challenged Melinas, who didn't quite understand the challenge. Sacus' vote was also challenged by the Union.

The ballots cast by these three were placed in challenged ballot envelopes, which were then sealed. Immediately after the election, Melinas, Dubinsky, and Sacus expressed their concern to Alper over the challenge to their votes, and their hope was that their votes would be counted against the Union. Sharon Sacus in her post-election affidavit confirmed that each of these three men had expressed their opposition to the Union, and told her that they all had voted against the Union.

In addition to the three challenged votes, the tally on election day showed six votes for the Union, three votes against the Union, and one void ballot, so it became necessary to consider the challenges. The Union's challenge alleged that these three part-time employees were not on the Company's payroll during the payroll period for voter eligibility. The Regional Director rejected these challenges, noting that although these employees were paid in cash and not by check, they nevertheless served as regular part-time employees and performed and same work as full-time employees.

On the opening and counting of these three ballots, much to the surprise of the employer, who had expected three additional "no" votes, one ballot was marked "yes" (favoring the Union) and two were marked "no" (against the Union). On one of the "no" ballots the "X" mark was placed outside of the small square designated for voting, but within the larger rectangle designating the "no" section of the ballot. The Company challenged the election results, contending that one of these employees undoubtedly made a mistake in marking his

ballot for the Union, because of the combined effect of limited understanding of the language and electoral process, and the atmosphere of fear and confusion created by the Union observer's conduct at the polling place.

The Regional Director rejected the company's objections, ruling that (1) the voters' intent as shown by their clearly marked ballots cannot be upset by subsequent statement of alleged mistakes in voting, and (2) the conduct of the Union representative in asserting a challenge did not "render impossible the holding of a fair election." Without any further hearing, the Board upheld the Regional Director's report, and ordered the company to bargain collectively with the Union. The company refused to bargain, and the Board's acting general counsel filed an unfair labor practice charge under § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5). The general counsel filed a motion for summary judgment. The Board granted the motion, and ordered the employer to recognize and bargain with the Union. The Board held that the company's objections to the election in the unfair labor practice proceedings were foreclosed by the Board's decision in the prior representation proceeding, and denied the Company any hearing on its objections to the election. Thus, in reviewing this unfair labor practice charge, we are required to examine the circumstances surrounding the representation election.

 In our assessment of the employer's attempt to set aside the election, we are mindful of certain basic rules followed by the Board in election contests: (1) The Board may exercise broad discretion in representation matters.[1] (2) Ballots cast under the safeguards provided by the Board's procedure presumably reflect the true desires of the participating employees.[2] (3) The objecting party must shoulder the burden of presenting specific evidence which *prima facie* warrants setting the election aside,[3] and this burden is a heavy one.[4] (4) That as a general proposition the secrecy of the ballot should not be invaded so as to permit the Board to consider post-election statements as to how an employee voted or intended to vote.[5]

 We also note that the Board's broad discretion in establishing the procedures and safeguards necessary to insure the fair and free choice of bargaining representatives, *see* § 9(c) of the Act; *NLRB v. A. J. Tower Co.*, 329 U.S. at 330, 67 S.Ct. 324, does not preclude "practical adjustments designed to protect the election machinery from the ever-present dangers of abuse and fraud." *NLRB v. A. J. Tower Co., supra*, at 331, 67 S.Ct. at 328. Where the conditions under which an election is conducted are such as to raise doubts that the election result reflects the true and informed choice of all employees, the Board and the courts have not hesitated to set aside the election. *See Fiber Leather Mfg. Corp.*, 167 NLRB 393, 66 LRRM 1056 (1967); *see also Marriott In-Flite Services Division v. NLRB*, 417 F.2d 563 (5th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 929, 25 L.Ed.2d 101 (1970).

 We assess the fairness and propriety of the election and the ballots cast by Melinas, Dubinsky, and Sacus in light of the

1. *Packard Motor Co. v. NLRB*, 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); *NLRB v. A. J. Tower Co.*, 329 U.S. 324, 330–32, 67 S.Ct. 324, 91 L.Ed. 322 (1946); *Macy's Missouri-Kansas Div. v. NLRB*, 389 F.2d 835, 842 (8th Cir. 1968).

2. *NLRB v. Zelrich Co.*, 344 F.2d 1011, 1015 (5th Cir. 1965); *Rockwell Mfg. Co. v. NLRB*, 330 F.2d 795, 796–97 (7th Cir.), *cert. denied*, 379 U.S. 890, 85 S.Ct. 161, 13 L.Ed.2d 94 (1964); *General Shoe Corp.*, 77 NLRB 124, 126, 21 LRRM 1337 (1948).

3. *NLRB v. Mattison Machine Works*, 365 U.S. 123, 124, 81 S.Ct. 434, 5 L.Ed.2d 455 (1961); *NLRB v. Skelly Oil Co.*, 473 F.2d 1079, 1083 (8th Cir. 1973).

4. *NLRB v. White Knight Mfg. Co.*, 474 F.2d 1064, 1067 (5th Cir. 1973); *NLRB v. Griffith Oldsmobile, Inc.*, 455 F.2d 867, 871 (8th Cir. 1972).

5. *See NLRB v. A. J. Tower Co.*, 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946); *T & G Mfg., Inc.*, 173 NLRB 1503, 70 LRRM 1038 (1969).

"totality of the circumstances," *LaCrescent Constant Care Center, Inc. v. NLRB,* 510 F.2d 1319, 1324 (8th Cir. 1975); *see also NLRB v. Decoto Aircraft, Inc.,* 512 F.2d 758, 761 (9th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 63, 46 L.Ed.2d 55 (1975). Apart and aside from the post-election affidavits submitted by Melinas, Dubinsky, and Sacus, the facts disclosed by the Regional Director's investigation permit a fair inference that all three of these persons intended to vote against the Union, and that one of them made a mistake in marking his ballot. First, the Union's challenge of Melinas, Dubinsky, and Sacus itself suggests that the Union felt their votes would be against its position. Second, Sacus, Melinas, and Dubinsky all came to the employer on one or more occasions prior to the election seeking an explanation of the election ballot and asking how to cast their votes. It is unlikely that these men would have sought advice on how to mark their ballots from the employer had they intended to vote for the Union. The fact that they acted as a group in seeking advice before the election further supports the inference that they all acted with a common purpose to vote against the Union. The secret ballot's usually conclusive indication of employee intent is seriously undermined by the strong evidence that those three elderly men did not adequately comprehend the balloting and election procedure. One voter was unable to place his "X" in the proper square to vote "no". Moreover, if perchance the ballot had been handed any of the three voters upside down, the place to vote "no" would have been on the left side of the ballot rather than on the right, contrary to what these men had been told prior to the election by both the employer and Sharon Sacus. Sacus, who had poor eyesight for reading, left his glasses at home on election day. Dubinsky and Melinas may well have become confused and disconcerted by the loud vocal challenge to Dubinsky. Finally, immediately following the election, these three individuals approached the employer protesting the challenge to their votes, which further indicates that

their sympathies lay with the employer and against the Union.

■ In light of these unique facts, we think the Board and the Regional Director should have given some consideration to the protestations of the employees that they all intended to vote "no" in the election and that one of them might have made a mistake. These statements were supported by the post-election affidavit of Sharon Sacus submitted by the employer in its objections to the election, which confirmed that both prior to and after the election, all three individuals told Sharon that they intended to vote against the Union.

■ We are left with the distinct impression from our review of the record that the vote in this election did not represent the true feelings of one of these three voters. The record, read as a whole, demonstrates that in the representation hearing the election should have been set aside and a new election called.

The Board's position is that statements regarding how an employee voted or intended to vote in a Board election may not be used as evidence to overturn the election. The Board cites *NLRB v. A. J. Tower Co.,* 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946), and *T & G Mfg., Inc.,* 173 NLRB 1503, 70 LRRM 1038 (1969). These cases do not precisely support the broad rule advocated by the Board, which would prohibit any consideration of statements by employees or others of how an employee intended or desired to vote in an unusual case such as this one. In *T & G Mfg., Inc.,* the Union and employer attempted by stipulation to withdraw a challenged vote which the parties agreed had been cast for the Union. That ballot, however, had been placed in the general ballot box and was not segregated into a separate envelope for challenged ballots. The Board held that a ballot, so cast in an election, may not be withdrawn. Here, however, there is no attempt to withdraw a vote knowingly and intelligently cast for one position or the other so as to affect the result of the election, but

rather a request that an employee have a chance to correct a mistake and record his true desire in a new election.

In *NLRB v. A. J. Tower Co.,* 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946), the employer sought to challenge a voter included in the eligibility list it had furnished to the Board. The Supreme Court approved the Board's rule forbidding the challenge of a voter after the votes had been cast, holding it to be justified by practical considerations and in accord with the National Labor Relations Act and the principle of majority rule. The court compared the representation election to a political contest in which voter eligibility challenges must be made, at the latest, on election day. The court noted:

> To permit * * * challenges * * * [after the election] would invade the secrecy of the ballot, destroy the finality of the election result, invite unwarranted and dilatory claims by defeated candidates[.] [*Tower Co.* at 331–32, 67 S.Ct. at 328. (citing Cooley, Constitutional Limitations, 8th ed. 1927, p. 1416.]

But here the privacy of the votes of Sacus, Dubinsky, and Melinas had already been compromised by the challenge procedures, even though the identity of the actual "yes" voter remained undisclosed.

The disruptive occurrence at the polls, coupled with the likelihood that one of these elderly gentlemen made a mistake in voting, demonstrates that in this unusual case the election procedure did not assure the fair and accurate expression of these three employees' wishes.

We emphasize that our holding is a narrow one. Ordinarily, neither the employer nor the employees may come forward after the election and dispute a vote recorded on a written ballot. However, given the special circumstances of this case, which reflect an unintended disruption of the voting process, the Board should have given some consideration to the post-election protestations of the electorate that a grievous error had been made, and that an employee who consistently voiced opposition to the Union may have erroneously marked his ballot in favor of the Union.

The Board's election rules, salutary as they may be, should not be applied so rigidly as to produce a result which, upon examination of the whole record, appears to be plainly erroneous.

The petition for review is granted, the cross-application for enforcement is denied.

WEBSTER, Circuit Judge, dissenting.

I respectfully dissent.

The laboratory climate which the Board requires for a certification election contemplates a setting in which a reasonable man is free to exercise his choice without fear of reprisal or promise of benefit. *See General Shoe Corp.,* 77 N.L.R.B. 124, 127 (1948). An election may be set aside if it is materially affected by any party's misrepresentations, use of coercion, or improper promise of economic benefit. *See NLRB v. Savair Mfg. Co.,* 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973) (union's promise to waive initiation fees of those signing authorization cards); *Landis Tool Co., Division of Litton Industries,* 460 F.2d 23 (3d Cir.), *cert. denied,* 409 U.S. 915, 93 S.Ct. 237, 34 L.Ed.2d 177 (1972) (employer's coercive tactics); *La-Crescent Constant Care Center, Inc. v. N. L. R. B.,* 510 F.2d 1319 (8th Cir. 1975) (union's material misrepresentation).

Additionally, the Board has recognized that if a particular group of employees would have difficulty expressing their intentions by use of a ballot printed in English, assistance in some form must be provided on request to insure that the election will reflect the employees' true intent. An election will be set aside if this assistance is not provided. *Fibre Leather Mfg. Corp.,* 167 N.L.R.B. 393 (1967). *See also Marriott In-Flite Services Division v. N. L. R. B.,* 417 F.2d 563, 565 (5th Cir. 1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 929, 25 L.Ed.2d 101 (1970).

In setting aside the Board's certification and bargaining orders in the instant case, the Court does not rely on these established

principles. It does not point to any aspect of the election process which fell below the "laboratory conditions" standards, or demonstrate that this was a case requiring assistance for certain employees.[1] Instead, the Court relies on its own determination, based principally on the statements and conduct of these three employees, that one of the employees made a mistake in voting. It seems to me that the objectives of the National Labor Relations Act are best served by refusing to allow such evidence of mistake to overturn an election, even if the result is that an occasional mistake which could affect the outcome of an election goes uncorrected.

Quite apart from the dilatory purpose for which assertions of mistake could be used, entertaining such contentions creates a very real opportunity to expose the employees to coercion, from either the employer or the union. If either party were free to question an employee about his vote simply because he had previously voiced a different sentiment, the employee would be subject to coercion to avoid accusations of betrayal from the side he had appeared to favor. The purpose of the secret ballot is to assure the voter his right to exercise his true choice in secret no matter what he may have felt it necessary to say previously.[2]

It is better that an election fairly conducted be allowed to stand regardless of claims of mistake than that employees whose votes were unsuccessfully challenged be made cat's-paws in the election contest. I therefore conclude that the Board did not abuse its discretion in refusing to set aside the election. I would grant the Board's cross-petition for enforcement.

1. The only arguable basis for a challenge to the election under these standards is the Board's failure to provide assistance to these employees, because of their limited ability to understand written English. However, no request to the Board for such assistance was made. Bilingual ballots would not have been helpful, because two of the three were virtually illiterate and none claimed to be able to read a language other than English.

In fact, the employees were coached by the company and by other employees on how to locate and identify the "yes" and "no" portions of the ballot. It is not clear that anything more could have been done.

2. As a result of the challenges in the instant case, the company and the union knew that two of the three persons challenged had voted in favor of the union and one had voted against it. If one of the three gentlemen did in fact secretly want the union, he could now vote "yes" in a second election only under pain of exposure.